2003 ND 108

**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Anthony Charles MATTHEWS, Defendant and Appellant.**

No. 20020261.

Supreme Court of North Dakota.

July 16, 2003.

Rehearing Denied Aug. 20, 2003.

Mark R. Boening, Assistant State's Attorney, Fargo, N.D., for plaintiff and appellee.

Steven D. Mottinger of Johnson, Ramstad & Mottinger, PLLP, Fargo, N.D., for defendant and appellant.

SANDSTROM, Justice.

[¶ 1] Anthony Charles Matthews appealed from a criminal judgment entered following conditional pleas of guilty for possession of a controlled substance with intent to deliver and possession of drug paraphernalia. We affirm the judgment of the trial court, concluding that under the

circumstances, law enforcement officers were able to enter Matthews' residence and conduct a warrantless search for information under the emergency doctrine.

## I

[¶ 2] In the early morning hours of October 24, 2001, a dispatcher at the Fargo Police Department received a 911 emergency call from a woman reporting that two men were being held at gunpoint at "some farm house on [sic] Horace." The two men reported as being held in Horace by four or five individuals with guns were B. Murray and his boss, later identified as Anthony Matthews. The caller identified herself as Murray's mother-in-law. The caller said Murray was crying and called her house because the gunmen were allowing him an opportunity to make one last phone call to say goodbye. The caller told the dispatcher that Murray's boss was "in the garage ... with guns to his head." The caller informed the dispatcher that Murray worked for a company called "Leak Seekers" and Murray and his boss "went to collect or something for a job."

[¶ 3] The dispatcher called the telephone company to place a trace on the caller's telephone in order to determine where Murray's call had originated. While waiting for the phone company to trace the call, the dispatcher learned Leak Seekers was owned by Anthony Matthews. A description of the two cars registered to Matthews was relayed to the Cass County Sheriff's Department so deputies could begin looking for the cars in the Horace area. Fargo police officers were also dispatched to the location of Matthews' business, which was at his home. When the police officers arrived at Matthews' residence, they found neither of Matthews' registered cars, but Murray's girlfriend's car was parked outside. Lights were on in the house, but no one answered the door when the officers knocked. Officers could hear Matthews' telephone ringing inside when a dispatcher called to try to make contact, but no one answered the phone. The officers looked in Matthews' garage and did not report anything suspicious to Sergeant Pallas, who was the shift commander that morning and was investigating the case at the police department. After the officers relayed to Sergeant Pallas what they observed at Matthews' residence, they left the house.

[¶ 4] The phone company reported to the dispatcher that it was unable to trace the phone call from Murray. Sergeant Pallas decided the police had to enter the home to gain information or to check for possible victims. Three officers met Sergeant Pallas at Matthews' house and entered the home without a search warrant, approximately 30 to 45 minutes after the dispatcher received the 911 call. Once inside the house, Sergeant Pallas started looking for business records that might show a client located in the Horace area. Sergeant Pallas directed the other officers to search the house to see whether either the victims or the gunmen were inside and to look for any business records that might identify the Horace location. In an upstairs bedroom located at the front of the house, an officer discovered marijuana in a clear plastic bag on a glass mirror on the floor. Lying next to it on the floor were a digital scale and plastic packaging for two or three marijuana bricks, which appeared to the officers to have recently contained marijuana. Another officer found a black plastic garbage bag containing 12 to 15 bundles of marijuana in the bedroom closet. Following these discoveries, the police secured a search warrant for the house. During the search, officers seized marijuana and other evidence of drug activity.

[¶ 5] Claiming an unlawful search, Matthews moved to suppress any evidence

found during the warrantless search of his home and any evidence obtained in the execution of the search warrant. The trial court denied Matthews' motion to suppress. Matthews entered conditional pleas of guilty to the charges, reserving his right to challenge the trial court's denial of the suppression motion under N.D.R.Crim.P. 11(a)(2). After conditionally pleading guilty, Matthews appealed the criminal judgment entered following the trial court's memorandum opinion and order denying the motion to suppress.

[¶ 6] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. This Court has jurisdiction under N.D. Const. art. VI, § 6, and N.D.C.C. §§ 28–27–01 and 28–27–02.

## II

[¶ 7] Matthews argues the evidence seized in his house should have been suppressed because the State did not meet its burden to prove the warrantless search was justified by an exception to the warrant requirement. Matthews contends the information provided by the 911 call and the details the officers discovered while investigating at Matthews' residence indicated that no one was at the residence, and the officers did not have probable cause.

[¶ 8] When reviewing a district court's ruling on a motion to suppress, we defer to the district court's findings of fact and resolve conflicts in testimony in favor of affirmance. *City of Grand Forks v. Zejdlik,* 551 N.W.2d 772, 774 (N.D.1996). We affirm the district court's decision unless, after resolving conflicting evidence in favor of affirmance, we conclude there is insufficient competent evidence to support the decision, or unless the decision goes against the manifest weight of the evidence. *City of Fargo v. Thompson,* 520 N.W.2d 578, 581 (N.D.1994). "That standard of review recognizes the importance

of the trial court's opportunity to observe the witnesses and assess their credibility, and we 'accord great deference to its decision in suppression matters.'" *State v. Bjornson,* 531 N.W.2d 315, 317 (N.D.1995) (quoting *State v. Brown,* 509 N.W.2d 69, 71 (N.D.1993)). "Questions of law are fully reviewable." *State v. Zimmerman,* 529 N.W.2d 171, 173 (N.D.1995).

[¶ 9] The Fourth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment, and Article I, section 8, of the North Dakota Constitution protect individuals from unreasonable searches and seizures. *City of Jamestown v. Dardis,* 2000 ND 186, ¶ 8, 618 N.W.2d 495. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The United States Supreme Court has noted the plain language of the first clause of the Fourth Amendment condemns unreasonable searches or seizures conducted without a warrant. *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

[¶ 10] "[I]f an individual has a reasonable expectation of privacy in the area searched or the materials seized, then a search and seizure within the protection of the Fourth Amendment has been conducted." *Lubenow v. N.D. State Highway Comm'r,* 438 N.W.2d 528, 531 (N.D.1989); *see Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The United States Supreme Court has indicated a "ba-

sic principle of Fourth Amendment law" is that warrantless searches and seizures inside a home are presumptively unreasonable. *Payton,* 445 U.S. at 586, 100 S.Ct. 1371. Nevertheless, the Fourth Amendment's prohibition of searches inside a home without a warrant is not absolute. Searches and seizures without a warrant are not unreasonable under the Fourth Amendment if the government can show the search or seizure falls under one of the well-delineated exceptions to the search warrant requirement. *State v. DeCoteau,* 1999 ND 77, ¶ 7, 592 N.W.2d 579.

▆ [¶ 11] One such exception is that law enforcement officers may enter a home and conduct a warrantless search if both probable cause and exigent circumstances exist. *Kirk v. Louisiana,* 536 U.S. 635, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002); *Payton,* 445 U.S. at 589–90, 100 S.Ct. 1371; *United States v. Davis,* 785 F.2d 610, 615 (8th Cir.1986).

[¶ 12] This Court has said, " 'Probable cause exists when the facts and circumstances within a police officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a man of reasonable caution in believing that an offense has been or is being committed.' " *State v. Kolb,* 239 N.W.2d 815, 817 (N.D.1976) (quoting *Witte v. Hjelle,* 234 N.W.2d 16, 17–18 Syllabus 3 (N.D.1975)). The Eleventh Circuit in *United States v. Holloway,* 290 F.3d 1331, 1337–38 (11th Cir.2002), however, articulated how the probable-cause element differs in cases in which law enforcement officers enter a residence due to an emergency:

> In emergencies, however, law enforcement officers are not motivated by an expectation of seizing evidence of a crime. Rather, the officers are compelled to search by a desire to locate victims and the need to ensure their own safety and that of the public. *See gener-*

*ally* Note, *The Emergency Doctrine, Civil Search and Seizure, and the Fourth Amendment,* 43 Fordham L.Rev. 571, 582 (1975) ("Generally it is not difficult to determine when the emergency doctrine is being applied. The police usually are acting to help a person in distress, not to find evidence of criminal acts."). Thus, in an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger. *See Koch v. Town of Brattleboro,* 287 F.3d 162 (2d Cir.2002) (stating probable cause for forced entry in response to exigent circumstances requires probability a person is in danger); *Tierney v. Davidson,* 133 F.3d 189, 196–97 (2d Cir.1998) (holding police officers may enter dwelling without warrant if, based on objective standard, they reasonably believe individual is in distress); *Root v. Gauper,* 438 F.2d 361, 364–65 (8th Cir.1971) (holding warrantless search based on emergency requires assessment of whether officers reasonably believe such action is necessary).

In *Holloway,* at 1338, *Koch,* at 169, *Tierney,* at 197, and *Root,* at 363, the officers, without a warrant, entered the residence where the emergency was reported to have occurred or was occurring, and the searches were upheld under the emergency exception.

▆ [¶ 13] " 'Unlike exigent circumstances, the emergency exception does not involve officers investigating a crime; rather, the officers are assisting citizens or protecting property as part of their general caretaking responsibilities to the public.' " *State v. Muir,* 67 Wash.App. 149, 835 P.2d 1049, 1053 (1992) (quoting *State v. Swenson,* 59 Wash.App. 586, 799 P.2d 1188, 1189 (1990)). To the extent that the emergency doctrine has been held to be distinguishable from exigent circumstances, the emergency doctrine does not

require probable cause but must be "actually motivated by a perceived need to render aid or assistance." *Id.* (citations omitted). Nonetheless, "a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (quoting *Terry v. Ohio*, 392 U.S. 1, 26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). In addition, "the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

[¶ 14] This Court has defined "exigent circumstances as 'an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence.'" *City of Jamestown v. Dardis*, 2000 ND 186, ¶ 15, 618 N.W.2d 495 (quoting *State v. Nagel*, 308 N.W.2d 539, 543 (N.D.1981)).

[¶ 15] This Court has also recognized the emergency doctrine, noting, in *Lubenow v. N.D. State Highway Comm'r*, 438 N.W.2d 528 (N.D.1989):

> "The emergency doctrine had its origin in a dictum enunciated by Justice Jackson in *Johnson v. United States*, 333 U.S. 10, 14–15, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948): 'There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with.' The Supreme Court later suggested such a situation might occur 'where the officers, passing by on the street, hear a shot and a cry for help and demand entrance in the name of the law.' [Citations omitted]. The doctrine has been applied in many varying circumstances....

> "For purposes of the instant case, the emergency or exigency doctrine may be stated as follows: police officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance. In applying this doctrine, two principles must be kept in mind. (1) Since the doctrine is an exception to the ordinary Fourth Amendment requirement of a warrant for entry into a home, the burden of proof is on the state to show that the warrantless entry fell within the exception. [Citations omitted]. (2) An objective standard as to the reasonableness of the officer's belief must be applied."

*Lubenow*, at 532 (quoting *Root v. Gauper*, 438 F.2d 361, 364–65 (8th Cir.1971)). *Lubenow* involved a police officer's entry into an open garage to assist a person in apparent physical distress.

[¶ 16] We have set out our standard for reviewing a trial court's determination of the existence of exigent circumstances, which equally applies to the emergency doctrine:

> The district court's findings of fact are reviewed giving "'due weight to the inferences drawn from those facts by ... judges and law enforcement officers.'" *United States v. Cooper*, 168 F.3d 336, 338 (8th Cir.1999) (citing *United States v. Ball*, 90 F.3d 260, 262 (8th Cir.1996) (quoting *Ornelas v. U.S.*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996))). "A de novo standard of review is applied to the ultimate determination of whether the facts constitute exigent circumstances...." *Id.* at 339. This is similar to our review of probable cause. *See State v. Kitchen*, 1997 ND 241, ¶¶ 12–13, 572 N.W.2d 106 (we defer to a trial court's findings of fact in the disposition of a motion to suppress, but whether

findings of fact meet a legal standard is a question of law which is fully reviewable).

*State v. DeCoteau,* 1999 ND 77, ¶ 15, 592 N.W.2d 579.

[¶ 17] The trial court, in denying Matthews' suppression motion, found an emergency was occurring and exigent circumstances existed to enter Matthews' home without a warrant because "[t]he police were facing a situation where it was reasonable to assume that the two men could be killed at any minute" and "[t]he officers reasonably believed that the Matthews['] residence, which coupled as the business address for Leak Seekers, might contain some kind of a record of the underlying debt that the men had gone to collect." The trial court concluded the circumstances of this case fit the definition of exigent circumstances, stating:

The facts which undergird this conclusion include: (1) a reasonable belief that the two men were being held at gunpoint; (2) that the gunmen had threatened to kill the men in the immediate time frame; (3) that the telephone trace had come up empty; (4) that there were lights on in the residence but no one answered a knock on the door; (5) that there might be someone present on the premises who might know something of the affair; and (6) that unless swift action was take[n], there was a reasonable likelihood that Matthews and Murray would be killed.

[¶ 18] "[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey,* 437 U.S. at 392, 98 S.Ct. 2408. Here the police also received a 911 call reporting the emergency. A 911 call reporting an emergency can be enough to support a warrantless search under the exigent circumstances exception, particularly when the caller identifies himself or herself. *See, e.g., United States v. Cunningham,* 133 F.3d 1070, 1072–73 (8th Cir. 1998), *cert. denied,* 523 U.S. 1131, 118 S.Ct. 1823, 140 L.Ed.2d 960 (1998); *United States v. Richardson,* 208 F.3d 626, 630 (7th Cir.2000).

A 911 call is one of the most common—and universally recognized—means through which police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help. This fits neatly with a central purpose of the exigent circumstances (or emergency) exception to the warrant requirement, namely, to ensure that the police or other government agents are able to assist persons in danger or otherwise in need of assistance.

*Richardson,* at 630.

### III

[¶ 19] Matthews argues the search should not be upheld because the search was conducted in Fargo and the emergency circumstances were occurring somewhere in Horace. The dissent argues the search was not justified because the officers were not under the belief that Matthews and Murray were inside the Matthews residence at the time of entry. The dissent cites no other jurisdiction holding that for the emergency doctrine to apply, a victim must be in danger within the dwelling to be searched. Instead, the general premise in federal case law is that "[t]he right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as peace officers." *United States v. Barone,* 330 F.2d 543, 545 (2nd Cir.1964); *see also Root v. Gauper,* 438 F.2d 361, 364 (8th Cir.1971); *Wayne v.*

United States, *318 F.2d 205, 211–12 (D.C.Cir.1963);* United States v. Goldenstein, *456 F.2d 1006, 1010 (8th Cir.1972). The United States Supreme Court has concluded exigent circumstances were present, and "a warrantless intrusion may be justified by hot pursuit of a fleeing felon, or imminent destruction of evidence, or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling."* Minnesota v. Olson, *495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (citations omitted).*

[¶ 20]   In applying the emergency doctrine, jurisdictions have upheld a warrantless search in circumstances in which the presence of a person inside the searched dwelling was unknown at the time of entry.   Some jurisdictions have upheld a warrantless search of a dwelling under the emergency doctrine for the purpose of investigation when the primary intent of the investigation was to gather evidence to render aid or assistance to someone in a dangerous situation. *Chaney v. State,* 612 P.2d 269 (Okla.Crim.App.1980); *People v. Mitchell,* 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607 (1976); *People v. Bondi,* 130 Ill.App.3d 536, 85 Ill.Dec. 773, 474 N.E.2d 733 (1984); *Oliver v. United States,* 656 A.2d 1159 (D.C.App.1995).

[¶ 21]   In *Chaney v. State,* 612 P.2d 269 (Okla.Crim.App.1980), an Oklahoma court upheld the defendant's arrest in a kidnapping case, holding there was reasonable cause to enter defendant's residence, given the circumstances.   The woman had been abducted. *Id.* at 277.   Her abductor called her husband the night she was kidnapped and told the husband it would cost him $500,000 to ransom his wife. *Id.* The husband contacted the FBI, and agents made arrangements to trace any further calls. *Id.* The next evening the kidnapper made a second call, outlining instructions for payment of the ransom.   That call was traced to the defendant's residence. *Id.* Law enforcement officers did not go there immediately.   Instead, the husband attempted to comply with the ransom demands, hoping to recover his wife alive. *Id.*

[¶ 22]   Later that evening, the kidnapper, calling a third time, accused the husband of failing to follow instructions and threatened to kill the man's wife.   This call was traced to a public telephone booth, and the defendant's palm print was found on the telephone.   It was at this point that officers entered the defendant's house without a warrant. *Id.*

[¶ 23]   Because an emergency existed, the court found that the officers acted correctly in organizing and carrying out the entry and arrest as quickly as possible. The court found, because of the immediate need to minimize any harm to the individuals being held hostage, it did not matter that the officers could have obtained a warrant between the first and third calls. *Id.* The court held that if the time required to secure a warrant could result in the loss of evidence, the escape of a suspect, or, above all, the death of a victim, then law enforcement officials may act without a warrant if probable cause exists.   The court stated:

> From the content of the third and last call, the police could justifiably believe that the kidnap victims were still alive, but that their deaths were imminent. Time was of the essence.   We hold that the officers were justified in conducting a warrantless search for either the victims *or evidence of their location.*

*Id.* (emphasis added).

[¶ 24]   The cases citing *Chaney* have held the emergency doctrine applies when "a risk of injury or death would likely be magnified if the search were delayed due to the time involved in obtaining a war-

rant." *Gipson v. State*, 82 S.W.3d 715, 720 (Tex.App.2002). Under the emergency doctrine, the consistent requirement is that it must be clear the police have a reasonable belief there is an immediate need to protect or preserve life. *Brimage v. State*, 918 S.W.2d 466, 483 n. 16 (Tex. Crim.App.1996). The cases applying the emergency doctrine in missing persons investigations hold that the doctrine clearly encompasses "searches for evidence that would lead to a kidnap victim as well as searches for the victim himself." *Brimage*, at 483 n. 16; *Travis v. State*, 921 S.W.2d 559, 570 (Tex.App.1996). The court in *Brimage* stated:

> Given the information known to the police at the time and based on the above excerpts from the testimony of Captain Gomez at the suppression hearing, there was sufficient evidence for the trial court to find that the warrantless search of appellant's residence was objectively reasonable under the Emergency Doctrine, the intent of the search being to locate complainant or, alternatively, to find evidence hopefully leading to the discovery of complainant at a different location.

*Brimage*, at 502–03.

[¶ 25] In *People v. Lucero*, 44 Cal.3d 1006, 245 Cal.Rptr. 185, 750 P.2d 1342 (1988), two young girls were playing in a park near one girl's home. About a half hour after the girls arrived at the park, a neighbor heard the defendant's goose cackling and saw the defendant walking toward the girls, telling them the goose would not hurt them. The girls appeared to be going into the defendant's yard. A short time later, the father of one of the girls became concerned about their failure to return. He and his wife made separate trips to the park but were unable to find the girls. They then called the San Bernardino County Sheriff's Department.

[¶ 26] The sheriff's department set up a temporary command post almost directly across the street from the defendant's house. About two hours later, a neighbor heard the defendant's car start up and drive down the street. Ten minutes later, she saw the car return to the defendant's driveway. Three to five minutes later, she saw the defendant drive away in the car. Within minutes of the car's second departure, she saw a fire in the rear portion of the defendant's house. Firefighters arrived at the scene, and a sergeant from the sheriff's department informed the fire captain of the missing girls and asked that he direct his men to search the burning house. After the fire was contained, the firefighters alerted the sheriff's deputies to a large bloodstain on the carpet of the defendant's living room. Several officers viewed the bloodstain. At about the time the deputies were examining the bloodstain, the bodies of the two girls were found in a nearby dumpster, wrapped in green trash bags. The defendant was convicted of two counts of first-degree murder and one count of arson.

[¶ 27] The court upheld the search of the defendant's house under the emergency exception to the warrant requirement, stating:

> A long-recognized exception to the warrant requirement exists when "exigent circumstances" make necessary the conduct of a warrantless search. " '[E]xigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers."

We believe the search for the missing girls justified the officers' brief entries into the house. We must consider the facts as known to the officers. Two young girls are missing. A fire of unknown origin ignites in a house directly across the street from the park where the girls had gone to play. The girls, their bodies, *or clues to their location* might be somewhere in the burning house. Thus, when the firefighters first arrived at the scene, Sergeant Anton advised Captain Bryant of the missing children and asked him to order his men into the burning house with oxygen equipment to look for the girls.

*Lucero*, 245 Cal.Rptr. 185, 750 P.2d at 1347 (citations omitted) (emphasis added). The court further stated, "Whether the officers were primarily interested in finding a lead to the missing girls or in investigating the fire is irrelevant. Either purpose would have justified their brief warrantless entries." *Id.*

## IV

[¶ 28] Most jurisdictions have not applied strict criteria to determine whether to uphold a warrantless search under the emergency exception to the warrant requirement under the Fourth Amendment; however, this Court, in *Lubenow v. N.D. State Highway Comm'r*, 438 N.W.2d 528, 533 (N.D.1989), quoted with approval the criteria developed in *People v. Mitchell*, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607, 609 (1976):

"(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

"(2) The search must not be primarily motivated by intent to arrest and seize evidence.

"(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched."

*See also Gallmeyer v. State*, 640 P.2d 837, 842 (Alaska App.1982) (explicitly adopting three-prong test from *Mitchell* ); *State v. Fisher*, 141 Ariz. 227, 686 P.2d 750, 760–61 (1984); *People v. Bondi*, 130 Ill.App.3d 536, 85 Ill.Dec. 773, 474 N.E.2d 733, 736 (1984); *State v. Illig*, 237 Neb. 598, 467 N.W.2d 375, 381 (1991); *State v. Follett*, 115 Or.App. 672, 840 P.2d 1298, 1302 (1992).

[¶ 29] In *Mitchell*, a maid had not been seen for hours and had not responded when summoned. 383 N.Y.S.2d 246, 347 N.E.2d at 608. "It was highly probable that she was somewhere in the hotel," and all of the circumstances led to the conclusion that she could be in danger. *Id.* at 610. Officers searched hotel rooms, and the defendant objected to evidence seized during the search. *Id.* at 608–09, 383 N.Y.S.2d 246, 347 N.E.2d 607. The first requirement under the test is that the police have valid reasons for the belief that an emergency exists, and such belief "must be grounded in empirical facts rather than subjective feelings." *Id.* at 609–10.

[¶ 30] The second requirement is that the motivation for the search must be the officers' protection of human life or property in imminent danger, rather than a desire to apprehend a suspect or gather evidence for use in a criminal proceeding. *Id.* at 610. In *Mitchell*, the detective "testified at the suppression hearing that he had no reason to believe a crime was being committed in defendant's room when he entered; the police report of the hotel's call for assistance stated that a possible kidnapping had taken place." *Id.* The judge at the suppression hearing made the express factual finding, affirmed by the appellate court, that "[a]t the time entry

was made into defendant's room, it was more for the purpose of rendering aid to a possibly ill person than to look for evidence of a crime." *Id.* The primary motivation for entering the defendant's room and the other rooms in the hotel was to locate the maid and render assistance to her. *Id.*

[¶ 31] Under the third requirement, the court stated that the limited privilege afforded to "law enforcement officials by the emergency exception does not give them carte blanche to rummage for evidence if they believe a crime has been committed. There must be a direct relationship between the area to be searched and the emergency." *Id.* For example, in *United States v. Goldenstein,* 456 F.2d 1006, 1010 (8th Cir.1972), the police, under emergency circumstances, validly entered the defendant's hotel room in search of him and, not finding him there, proceeded to search through his belongings. The court suppressed evidence obtained from one of the defendant's suitcases.

[¶ 32] The court in *Mitchell* expressly stated it hastened to admonish that the limited privilege to investigate emergencies without a search warrant is subject to judicial scrutiny. 347 N.E.2d at 611. "Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life." *Id.* at 611. "The United States Supreme Court has stated that '[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others.'" *Id.* (quoting *Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)).

[¶ 33] Our case law has applied an objective standard as to the *Mitchell* reason-

ableness criteria of law enforcement officers' actions. *State v. Boyd,* 2002 ND 203, ¶ 14, 654 N.W.2d 392. The Eighth Circuit has stated:

"[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.... And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"

*Root,* 438 F.2d at 364–65 (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

[¶ 34] In *People v. Bondi,* 130 Ill. App.3d 536, 85 Ill.Dec. 773, 474 N.E.2d 733, 735 (Ill.App.1984), an Illinois court held in a missing persons case that no warrant was necessary when the authorities' entry into and search of the premises was for the purpose of providing aid to persons or property in need thereof. In applying the *Mitchell* test, the court concluded:

(1) that the fact that Genevieve Bondi was reported missing gave the authorities reasonable grounds to believe that she may be in imminent danger of death or serious bodily harm, (2) that as such the primary intent of the search of the premises was to locate her and provide assistance to her, not to seize evidence against the defendant, and (3) that her residence and the property surrounding it were the most likely places to search for evidence of the whereabouts of a missing occupant.

*Bondi,* at 736.

[¶ 35] In upholding that an emergency exception exists, some courts have limited

the doctrine and held some situations automatically fall outside its scope, such as a delayed response to the emergency, or a planned warrantless search with an accompanying intent to arrest or to obtain evidence. *Johnson v. State*, 97 Nev. 621, 637 P.2d 1209, 1211 (1981); *Root v. Gauper*, 438 F.2d 361, 365 (8th Cir.1971); *Thompson v. Louisiana*, 469 U.S. 17, 21, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984). Nevada has affirmatively quoted E. Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment*, 22 Buff. L.Rev. 419, 426–27 (1973):

> Law enforcement officers may enter private premises without either an arrest or a search warrant to preserve life or property, to render first aid and assistance, or to conduct a general inquiry into an unsolved crime, provided they have reasonable grounds to believe that there is an urgent need for such assistance and protective action, or to promptly launch a criminal investigation involving a substantial threat of imminent danger to either life, health, or property, and provided, further, that they do not enter with an accompanying intent to either arrest or search. If, while on the premises, they inadvertently discover incriminating evidence in plain view, or as a result of some activity on their part that bears a material relevance to the initial purpose for their entry, they may lawfully seize it without a warrant.

*Geary v. State*, 91 Nev. 784, 544 P.2d 417, 421 n. 3 (1975).

[¶ 36] In the case of a child kidnapping, it has been held that unlike some other emergency categories for which police officers must point to articulable facts beyond the initial report to make a showing of a reasonable need for immediate action, the very nature of a kidnapping presents "unusually compelling circumstances." *Oliver v. United States*, 656 A.2d 1159, 1167 (D.C.App.1995).

[¶ 37] The court articulated that it is unreasonable to expect police to leave the victim in the control of the captor while officers obtain a warrant. *Id.* This is true even if the victim apparently is being well-treated. *Id.* A kidnapping victim is placed in continuing danger of harm at the hands of his or her captor. *Id.* Police must not delay rescue to obtain a warrant if probable cause exists to believe that a kidnapping victim is being held, because in such circumstances, time is of the essence. *Id.*

[¶ 38] The guidelines in *Mitchell*, as well as the holdings announced in *Chaney*, 612 P.2d 269, *Bondi*, 130 Ill.App.3d 536, 85 Ill.Dec. 773, 474 N.E.2d 733, and *Oliver*, 656 A.2d 1159, fully apply in the instant case, justifying the emergency exception under the exigent circumstances doctrine and allowing the officers to enter the Matthews residence without a warrant.

[¶ 39] The investigating officer, Sergeant Pallas, and the other officers had a justifiable reason to believe that an emergency existed. The district court found the evidence led to a reasonable assumption "that the two men could be killed at any minute, thus dire circumstances existed." The district court's findings were supported by sufficient and competent evidence. The officers' beliefs were grounded in empirical facts. A 911 call informed them that Matthews and Murray were being held at gunpoint at an unknown location and were in need of police intervention or emergency first aid. *Mitchell*, 383 N.Y.S.2d 246, 347 N.E.2d at 609.

[¶ 40] At the suppression hearing, Sergeant Pallas testified that after the 911 call came in, law enforcement officers were dispatched to the Horace area and to the address of Leak Seekers, which was also the address of Matthews' residence, in

Fargo. While at Matthews' residence, the officers found Murray's girlfriend's vehicle parked out front. The officers could hear the telephone ringing when dispatch called the home, but no one inside the house answered it, and although the officers saw lights on in the house, nobody answered the door when the officers knocked. The officers then left Matthews' residence.

[¶ 41] Sergeant Pallas testified he decided to enter Matthews' residence when the phone call from Murray to his mother-in-law could not be traced, which was also a short time after the investigating officers communicated what they initially found at Matthews' residence. Two officers and a trainee were dispatched back to the residence to meet Sergeant Pallas. When questioned during direct examination at the suppression hearing about what Sergeant Pallas thought he might find inside Matthews' residence, Sergeant Pallas testified:

> Information in relation to where this person was at. The defendant has a business "Leak Seekers". The information that we received from the mother-in-law stated that he was going to go out and get payment or services rendered from a job. I was hoping to recover information as far as a[n] address or a receipt book or business ledger in this address.

When asked if he had any other reason, apart from looking for information, to enter Matthews' residence, Sergeant Pallas stated: "Other than possibly if subjects were inside. The actual caller, being the vehicle was out front. There was always that possibility that they were calling from there and not the Horace area." On cross-examination, Sergeant Pallas testified:

Q. Did you believe they were at the residence at 1335?

A. At that point I wasn't sure if they were there or they were in Horace without knowing what was inside that home.

Q. Did you have any reason to believe anybody was at 1335?

A. Could of been. I guess without being able to trace where the phone call came from initially anything was possible.

[¶ 42] It is clear from the evidence that the officers had no intent to enter Matthews' premises to arrest anyone or to search for criminal behavior; instead, the sole motive for entering was to offer aid or assistance to Matthews and Murray. The district court found the officers' sole intent in entering Matthews' residence was to look for Matthews and Murray or for information that might lead to their location. The officers did not enter the premises until they were told the phone call from Murray to his mother-in-law could not be traced. Then the officers believed an emergency existed and immediate action needed to be taken. Sergeant Pallas testified at the suppression hearing that the primary reason for entering Matthews' residence was to offer assistance to the two men in danger and search for the men or information regarding the location in Horace where the men were being held, not to make an arrest or investigate a crime scene.

[¶ 43] They had a reasonable basis, approximating probable cause, for associating the emergency with the place to be searched. The officers were unable to trace where the phone call to Murray's mother-in-law came from. It is reasonable the officers would have searched Matthews' residence, which was also his place of business, Leak Seekers, because it was mentioned in the 911 call with Murray's mother-in-law. It is reasonable to believe that the officers' search would produce either Matthews or Murray or information leading to their location. In upholding the

search, the district court stated, "The officers reasonably believed that the Matthews residence, which coupled as the business address for Leak Seekers, might contain some kind of a record of the underlying debt that the men had gone to collect." The police officers in this circumstance, however, could have also reasonably believed there remained a possibility that the men may have been inside the house. The warrantless search of Matthews' residence was for Matthews' and Murray's safety, to either find the men inside the house or find information that could have led the officers to the location in Horace where the two men were being held.

[¶ 44] Applying the *Mitchell* principles to this case, the officers' entry of Matthews' house without a warrant was justified under the circumstances. All of these factors taken into account make it clear the district court did not err in concluding that the officers did not have an intent to arrest or to make an unreasonable search when they entered Matthews' residence but had, in fact, one single interest—to provide Matthews and Murray with emergency aid. That action falls completely within the emergency doctrine exception to the Fourth Amendment prohibition against warrantless, nonconsensual searches. *Chaney,* 612 P.2d 269; *Mitchell,* 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607; *Bondi,* 130 Ill.App.3d 536, 85 Ill.Dec. 773, 474 N.E.2d 733; and *Oliver,* 656 A.2d 1159. The scope of the search was reasonable in view of its objectives. The district court was correct in refusing to suppress the evidence seized through the warrants obtained by reason of the officers' entry into Matthews' residence.

[¶ 45] Professor LaFave concludes his discourse on this topic by noting:

[I]f . . . it is permissible to enter premises to rescue a threatened kidnap victim

thought to be within, then surely it must likewise be permissible to make an immediate warrantless entry upon a reasonable belief that information therein will disclose where that victim is being held.

3 Wayne R. LaFave, *Search and Seizure* § 6.5(d) (3d ed.2002). His logic and reason are compelling.

## V

[¶ 46] Under the circumstances in this case, the police officers' actions fall within the emergency exception to the Fourth Amendment protections from unreasonable searches and seizures, justifying a warrantless entry into the Matthews residence. We affirm.

[¶ 47] GERALD W. VANDEWALLE, C.J., and WILLIAM A. NEUMANN, and MARY MUEHLEN MARING, JJ., concur.

KAPSNER, Justice, dissenting.

[¶ 48] I respectfully dissent. I would reverse the judgment of the trial court and remand the case to allow Matthews to withdraw his guilty pleas.

[¶ 49] A "basic principle of Fourth Amendment law" is that warrantless searches and seizures inside a home are presumptively unreasonable. *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In *Payton,* the United States Supreme Court reiterated that "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" 445 U.S. at 585, 100 S.Ct. 1371 (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1980)).

[¶ 50] The Fourth Amendment's prohibition of searches inside a home without a warrant is not absolute; searches and sei-

zures without a warrant are not unreasonable under the Fourth Amendment if the government can show the search or seizure falls under one of the well-delineated exceptions to the search warrant requirement. *State v. DeCoteau*, 1999 ND 77, ¶ 7, 592 N.W.2d 579. For example, law enforcement officers may enter a home and conduct a warrantless search if both probable cause and exigent circumstances exist. *Kirk v. Louisiana*, 536 U.S. 635, 638, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002); *Payton*, at 589–90, 100 S.Ct. 1371; *United States v. Davis*, 785 F.2d 610, 615 (8th Cir.1986). In such circumstances, "the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

[¶ 51] The majority concludes law enforcement officers were able to enter Matthews' residence and conduct a warrantless search for information under the emergency doctrine. In my opinion, the emergency doctrine does not provide an exception to the warrant requirement under the facts of this case. The emergency was reported as occurring at a farmstead in or near Horace. The warrantless search was conducted at Matthews' residence in Fargo. In upholding the search, the trial court stated, "[t]he officers reasonably believed that the Matthews['] residence, which coupled as the business address for Leak Seekers, might contain some kind of a record of the underlying debt that the men had gone to collect." The majority, at ¶ 43, contends the law enforcement officers could also have reasonably believed there remained a possibility that the men may have been inside the house. However, apart from Sergeant Pallas' testimony alluding to the notion that "[t]here was always that possibility that [the men] were calling from [the resi-

dence]," there is nothing in the record to support the majority's contention. The 911 caller reported that Matthews and Murray were at a farmstead in Horace and that Matthews was being held at gunpoint in the garage. The investigating officers looked in Matthews' garage in Fargo and communicated to Sergeant Pallas nothing suspicious about the garage. No one answered the door when the officers knocked on it. There was no movement reported from inside the house. The officers left the residence after finding nothing suspicious to warrant an immediate entry.

[¶ 52] The State did not argue, as the majority relies for support, that Matthews and Murray could have been in the Fargo residence. In its brief the State argued "[t]he peace officers in this case weren't sure where Matthews was, but they did not enter his residence principally because they believed he was in it, . . . Rather the officers entered Matthews' home because they hoped to find some document leading them to where he and Murray were being held at gun point in rural Horace." The State reemphasized at oral argument the warrantless search of Matthews' residence was for information which might lead the officers to the location in Horace where the two men were being held; the officers did not search Matthews' residence because they believed the two men were being held at gunpoint inside the residence.

[¶ 53] In this case, the officers believed an emergency existed elsewhere; their intent was to enter the premises for investigative purposes, in the mere hope of finding some information that could lead them to the location of the emergency. This Court, in *Lubenow v. N.D. State Highway Comm'r*, 438 N.W.2d 528, 533 (N.D.1989), emphasized "there must be a direct relationship between the area to be searched and the emergency." The premises

searched in this case had no direct relationship to the emergency that was reported to be occurring.

[¶ 54] The majority, at ¶ 28, acknowledges the third prong of the *Mitchell* test. "There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." With respect to the search of Matthews' house, the police had nothing more than the *hope* that the residence *might* contain information which might lead them to the location where they believe the two men were endangered. The place to be searched must have a "direct relationship" to the emergency. *Lubenow,* at 533. This prong is not satisfied when the police enter with the mere hope of finding information that might lead them to the location of the emergency.

[¶ 55] The trial court, in denying the suppression motion, reviewed the circumstances of both police visits to Matthews' home. Regarding the first visit, the court noted the officers found nothing suggesting an emergency at that location: "Unable to make contact with anyone and not finding anything obviously amiss, the officers left the premises." When the officers went back to Matthews' home a second time, it was with an investigative purpose. The court found: "The officers reasonably believed that the Matthews['] residence, which coupled as the business address for Leak Seekers, might contain some kind of a record of the underlying debt that the men had gone to collect." The trial court did not find that the police believed there could be someone on the premises who needed the type of assistance which is contemplated by the emergency doctrine. Rather the trial court found, as one of the facts which supported the application of the exigent circumstances, "that there might be someone present on the premises who might know something of the affair."

[¶ 56] In the cases cited by the majority in which the emergency doctrine has been applied and the location of a person associated with the searched dwelling was unknown at the time of entry, the officers who entered the premises without a warrant had an objectively reasonable belief that the premises searched were intimately connected with the emergency need for assistance. In *Chaney v. State,* 612 P.2d 269, 277 (Okla.Crim.App.1980), a kidnapping case, officers traced a ransom call to the defendant's home. Officers traced a later call to a public phone where the defendant's palm print was found. In the later call, the defendant threatened to kill the kidnapped victim because his demands had not been met. It was at this point the officers organized the entry into the defendant's home. Although the opinion quoted by the majority refers to finding "evidence of their location," the entry into the residence was based on facts rising to probable cause to relate the defendant's residence to the emergency.

[¶ 57] The majority also cites *Brimage v. State,* 918 S.W.2d 466, 501–02 (Tex. Crim.App.1996), for the proposition that officers may conduct a warrantless entry under the emergency doctrine to search for evidence that would lead to a kidnap victim or the victim himself. In *Brimage,* prior to the officers' decision to search the defendant's home without a warrant, the officers knew: (1) a woman had been missing for over two days; (2) the defendant was acquainted with the woman and her car had been found unlocked with her purse in plain view and parked near defendant's residence in an area where, according to the woman's boyfriend, she never parked; (3) the woman was observed on the morning of her disappearance driving near the defendant's house; (4) the woman was wearing a red blouse when last seen and a suitcase abandoned by the defendant

contained a piece cut from a red blouse which appeared to have a bloodstain, scissors, and a piece of fabric from a pair of blue pajama pants; and (5) the defendant's uncle who, on his own, had entered defendant's home reported finding part of a pair of blue pajamas, other evidence of cut-up women's clothing, and evidence of a "violent struggle" in the master bedroom. *Brimage,* at 501–02. The officers had an objective basis to reasonably believe the woman was injured, in need of assistance, and her disappearance was connected with the defendant's home.

[¶ 58]   Similarly, in *People v. Lucero,* 44 Cal.3d 1006, 245 Cal.Rptr. 185, 750 P.2d 1342, 1347 (1988), officers entered the defendant's home located across from the park where two missing girls had last been seen when firefighters, who had just been inside the house, reported a large bloodstain on the living room carpet. Although the opinion makes reference to the fact that "clues to their location" may be inside, the entry of the home was based on objective factors, not the mere hope of finding clues about the missing girls current location.

[¶ 59]   In each of the cases cited by the majority, the courts found specific, articulable and objective facts that directly related the location searched to the emergency that was occurring.  In this case, the entry into Matthews' residence was based only on the hope that, because the residence was also the business location of Matthews, the officers might find some information about the debt Matthews and his companion had gone to collect.  If law enforcement could enter without a warrant, solely for investigative purposes, merely hoping to find information which would lead them to the place that an emergency was believed to be occurring, the investigative purpose would swallow the warrant requirement.

[¶ 60]   The situation appeared to the officers to be dire;  they believed there was a real threat to Matthews and Murray.  But all information known to the officers indicated the threat existed somewhere near Horace, not at Matthews' residence.  It is tempting to hold that with a threat so serious as the possible murder of two men, the warrant requirement should give way to the need to act quickly.  But the United States Supreme Court has specifically stated the seriousness of the alleged incident that police are investigating is not a basis for finding exigent circumstances to justify a warrantless search.  *Mincey v. Arizona,* 437 U.S. 385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Payton v. New York,* 445 U.S. 573, 583–90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Thompson v. Louisiana,* 469 U.S. 17, 21, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984).  The Fourth Amendment protections from unreasonable searches and seizures erects a "firm line at the entrance to the house." *Payton,* at 590, 100 S.Ct. 1371.  "[P]olice officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." *Kirk v. Louisiana,* 536 U.S. 635, 638, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002).

[¶ 61]   The State failed to meet its burden to demonstrate an exception to the warrant requirement and overcome the presumption of unreasonableness which attaches to warrantless home entries.  Under the circumstances in this case, without a reasonable belief someone was in danger inside the residence, or some other objective basis to directly relate Matthews' house to the emergency, the officers' warrantless entry into Matthews' home to search for information was unreasonable.

[¶ 62]   Carol Ronning Kapsner