Filed 2/8/11 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2011 ND 23

State of North Dakota, Plaintiff and Appellee

v.

Jason Robert Huber, Defendant and Appellant

No. 20100209

Appeal from the District Court of Morton County, South Central Judicial District, the Honorable Robert O. Wefald, Judge.

AFFIRMED.

Opinion of the Court by Sandstrom, Justice.

Jackson J. Lofgren, Assistant State’s Attorney, Morton County Courthouse, 210 2nd Avenue NW, Mandan, N.D. 58554, for plaintiff and appellee.

Kent M. Morrow, 411 North 4th Street, P.O. Box 2155, Bismarck, N.D. 58502-2155, for defendant and appellant.

State v. Huber

No. 20100209

Sandstrom, Justice.

[¶1] Jason Huber appeals the district court’s criminal judgment convicting him of manufacture and possession of a controlled substance and possession of drug paraphernalia.  We affirm, concluding the discovery of evidence without a warrant was justified under the emergency exception.

I

[¶2] Huber was charged with manufacture and possession of a controlled substance and possession of drug paraphernalia following a warrantless search of his apartment by law enforcement.  Huber moved to suppress the evidence gathered during this search, and a hearing was held on his motion.  The testimony at the hearing described the events that led to the collection of evidence from Huber’s apartment.  During the early morning hours of December 11, 2009, Huber’s landlord testified he received a call from another tenant complaining of a “terrible odor.”  Within ten minutes, he arrived at the building and went to the caller’s unit to inspect the source of the odor.  The landlord confirmed the “ammonia smell” the caller complained of and testified he thought maybe a sewer vent was plugged in the building.  Unsure of the odor’s source, he contacted the Mandan Fire Department for assistance.

[¶3] Two firefighters responded and proceeded to check the building.  Before approaching Huber’s apartment, the landlord testified he and the firefighters had checked all other units and failed to find the odor’s source.  By this time they were joined by two Mandan police officers who were called to help identify the source of the problem, which is “routine” procedure according to firefighter Mitch Bitz.  Bitz testified he and the other responders noticed Huber’s window was open despite the bitterly cold weather, and speculated that he might be “airing something out.”  For several minutes, the police officers and the landlord knocked on Huber’s door and asked him to open it, but received no response.

[¶4] The landlord began to unlock Huber’s door with the master key to the building.  Huber’s lease reserved a “right of entry” to the landlord in certain situations.  This provision stated in part:  “Landlord has the right to enter the rental unit at any time in case of an emergency, or if landlord reasonably believes resident has abandoned the premises, or if landlord reasonably believes resident in violation of any of the provisions of this contract.”  According to the landlord, he felt he needed to inspect Huber’s apartment because he believed there was an emergency at hand since it was extremely cold outside and the building’s tenants might have to be evacuated.

[¶5] When the landlord began to unlock the door, Huber immediately cracked it open.  The ammonia and chemical smell was immediately apparent and was “pouring” out of the apartment according to the emergency personnel.  Officer Bill Stepp testified the emergency personnel explained to Huber that the firefighters needed to enter the apartment to check for explosive gases and the source of the odor, but he was unwilling to let them in.  According to the testimony of all present, Huber remained insistent that nobody enter.  Officer Stepp explained how they finally entered Huber’s apartment:

Q So at some point then did you have to kind of take over the situation?

A Yes, I did.

Q Could you explain?

A I finally told him that he needed to back up and stand aside, that the firemen were going to come in with their meters and investigate.  Officer Doolin was standing right in front of me, Mr. Huber backed up, as he did . . . I heard something heavy hit the floor and thud.  I couldn’t see what was going on at that point.

The “thud” Officer Stepp referred to was a propane torch falling to the floor, which was lit as it hit the carpet.

[¶6] Huber was handcuffed and placed in a police car, though he was told he was not under arrest.  In response to the fumes, the firefighters entered Huber’s apartment wearing self-contained breathing equipment.  Firefighter Bitz testified they discovered a glass pipe and multiple propane cylinders before finding a person lying under the blankets in a back room.  According to Bitz, the police officers briefly entered to remove this person, and the firefighters then proceeded to inspect the rest of the apartment.  The officers were called in again while the firefighters were continuing to inspect the apartment with their meters for the source of the odor.  Officer Stepp testified the likely source was discovered in the bathroom during this inspection:

I remember seeing there was like a power cord that was hardwired to the exhaust fan that was pulled out.  There was a crock-pot sitting on the counter.  They showed me underneath the sink and the cabinet.  There was an assembly, which I recognize like the coffee filter apparatus and the residue and stuff which I recognized.  It looked like a partially dismantled meth lab apparatus.  In the toilet the water was like a dark blue or black and it looked like strips of—it looked like paper, but which I recognized as being the Lithium batteries that are peeled apart to get the Lithium out in order to use in the manufacturing process.  At that point again the odor was so bad in there that I backed out of the apartment.

[¶7] Huber was arrested and taken to the Mandan law enforcement center.  He was read his 
Miranda
 rights and then interviewed.  According to law enforcement testimony, Huber admitted while in custody that his apartment contained components of a methamphetamine lab, and he consented to a search of his apartment.  The Mandan narcotics unit obtained a search warrant and seized the evidence from Huber’s apartment.

[¶8] The district court denied Huber’s motion to suppress, concluding the entry of law enforcement into his apartment was justified by an emergency situation and exigent circumstances.  The court further made “positive note” of the right of entry retained by the landlord in emergency situations, as well as the efforts of the personnel present to secure the tenants’ safety without pausing to thoroughly search the apartment.  Huber conditionally pled guilty to the charges, reserving his right to appeal the district court’s denial of his motion to suppress, and was sentenced to twenty years in prison with eight years suspended.

[¶9] On appeal, Huber argues there was no emergency or exigent circumstances justifying law enforcement’s entry into his apartment without a search warrant.

[¶10] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27-05-06.  Huber’s appeal was timely under N.D.R.App.P. 4(b).  This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 29-28-06.

II

[¶11] Huber argues the events on the night he was arrested did not constitute exigent circumstances necessitating law enforcement’s entry into his apartment without a warrant.

[¶12] We will affirm the district court’s decision on a suppression motion if the evidence is fairly capable of supporting the court’s findings and the decision is not contrary to the manifest weight of the evidence.  
City of Fargo v. Thompson
, 520 N.W.2d 578, 581 (N.D. 1994).  The right to be secure in one’s home against unreasonable searches and seizures is guaranteed in the United States Constitution.  U.S. Const. amend. IV.  When a search or seizure is within the protection of the Fourth Amendment, a warrant generally must be obtained.  
State v. Hammer
, 2010 ND 152, ¶ 11, 787 N.W.2d 716.  Exigent circumstances and emergencies, however, may present an exception to the warrant requirement.  
See
 
Hoover v. Director, N.D. Dep’t of Transp.
, 2008 ND 87, ¶ 15, 748 N.W.2d 730 (“Consent and exigent circumstances are exceptions to the warrant requirement.”); 
City of Fargo v. Ternes
, 522 N.W.2d 176, 178 (N.D. 1994) (“The emergency doctrine allows police to enter a dwelling without a warrant . . . .”).  “Exigent circumstances” are “an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence.”  
State v. DeCoteau
, 1999 ND 77, ¶ 15, 592 N.W.2d 579.  We have explained our standard of review in reviewing a district court’s finding of exigent circumstances, which applies equally to the emergency doctrine:

The district court’s findings of fact are reviewed giving “‘due weight to the inferences drawn from those facts by . . . judges and law enforcement officers.’”  
United States v. Cooper
, 168 F.3d 336, 338 (8th Cir. 1999) (citing 
United States v. Ball
, 90 F.3d 260, 262 (8th Cir. 1996) (quoting 
Ornelas v. United States
, 517 U.S. 690 (1996))).  “A de novo standard of review is applied to the ultimate determination of whether the facts constitute exigent circumstances . . . .”  
Id.
 at 339.  This is similar to our review of probable cause.  
See
 
State v. Kitchen
, 1997 ND 241, ¶¶ 12-13, 572 N.W.2d 106 (we defer to a trial court’s findings of fact in the disposition of a motion to suppress, but whether findings of fact meet a legal standard is a question of law which is fully reviewable).

Id.

[¶13] An exigent circumstances analysis is analogous to applying the emergency exception.  
State v. Nelson
, 2005 ND 11, ¶ 11, 691 N.W.2d 218.  Because the testimony of the landlord and emergency responders focused on the perceived danger to the residents and not on a concern for destruction of property or evidence, this case is more appropriately evaluated in the context of the emergency exception.  “Unlike exigent circumstances, the emergency exception does not involve officers investigating a crime; rather, the officers are assisting citizens or protecting property as part of their general caretaking responsibilities to the public.”  
State v. Matthews
, 2003 ND 108, ¶ 13, 665 N.W.2d 28 (quotation omitted).  “[T]he emergency doctrine does not require probable cause but must be actually motivated by a perceived need to render aid or assistance.”  
Id.
 (quotation omitted).  We have outlined three requirements for applying the emergency exception:

(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

(2) The search must not be primarily motivated by intent to arrest and seize evidence.

(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

Id.
 at ¶ 28 (quotation omitted).

[¶14] We use an objective standard in evaluating an officer’s reasonable belief that an emergency existed.  
Nelson
, 2005 ND 11, ¶ 12, 691 N.W.2d 218.  “Whether an objective officer would believe an emergency existed is a question of fact.”  
State v. Gill
, 2008 ND 152, ¶ 20, 755 N.W.2d 454.

[¶15] Huber argues the actions of those present at the scene prove they did not believe there was an emergency at hand.  He notes the firefighters did not arrive until an hour after the landlord arrived, the complaining tenant did not call 911, the building was not evacuated until after the firefighters entered Huber’s apartment, and the odor coming from Huber’s apartment was allegedly not a concern until law enforcement had gained entry.  Additionally, firefighter Bitz testified the firefighters initially responded under the impression that it was not an emergency call.  Huber contends that if this had truly been an emergency, those responding would have acted with greater urgency than they did to resolve the situation.

[¶16] Despite Huber’s subjective interpretations, we note first how many people at the scene testified they believed it was an emergency.  The landlord believed there was an “emergency afoot.”  Firefighter Bitz testified their initial response was routine, but the circumstances they discovered at the scene led the firefighters to consider it an emergency.  Officer Jessica Doolin testified she told Huber it was an emergency when requesting he open his apartment door.  Officer Stepp testified he believed the landlord should enter to check on a potential emergency because “the ammonia and chemical smell was just pouring out of that apartment.  It was almost unbelievable how much was coming out of that doorway.”

[¶17] The testimony of the responders reflects a collective belief that the ammonia fumes and their uncertain origin presented a serious danger to the building’s occupants.  We have previously held the first requirement of the emergency exception is met when officers have a reasonable belief that a situation involves a serious threat to an individual’s health.  
Nelson
, 2005 ND 11, ¶ 13, 691 N.W.2d 218.  While the degree of potential harm in this case is disputed by Huber, the evidence showed the chemical fumes coming from his apartment were dangerous to others.  Firefighter Bitz testified the complaining tenant’s apartment was consumed by a “very offensive odor” that a person could not remain in for a sustained period of time.  The firefighters who entered Huber’s apartment wore full self-contained breathing equipment for protection.  The police officers who entered Huber’s apartment without this breathing equipment were treated at a hospital for chemical exposure.  Additionally, the toxic nature of the fumes required the building’s tenants to be evacuated outside into temperatures that were below zero with a strong wind chill.

[¶18] The district court noted some of this testimony in declaring, “Until firefighters could identify the source of the odor, they had to assume a situation dangerous to everyone in the area.”  The testimony of those present reflects genuine concern and confusion over strong ammonia fumes spreading in a residential building.  Under these circumstances, it was reasonable for the district court to find law enforcement and all others present had a reasonable basis to believe there was an emergency at hand.

[¶19] The next step in the emergency exception test is to evaluate whether the search of Huber’s apartment was motivated by an intent to arrest or seize evidence.  A planned warrantless search motivated by an intent to gather evidence or make an arrest is beyond the scope of the emergency exception.  
Matthews
, 2003 ND 108, ¶ 35, 665 N.W.2d 28.  If, while on the premises, however, law enforcement “inadvertently discover[s] incriminating evidence in plain view, or as a result of some activity on their part that bears a material relevance to the initial purpose for their entry, they may lawfully seize it without a warrant.”  
Id.
 (quoting 
Geary v. State
, 91 Nev. 784, 544 P.2d 417, 421 n. 3 (1975)).

[¶20] The landlord was the first to try to enter Huber’s apartment.  He unlocked Huber’s door and intended to have the unit inspected under his reserved authority in the lease.  The firefighters then entered the apartment by themselves, intending to search for the source of the ammonia fumes.  Firefighter Bitz explained how the situation unfolded:

Q Upon your entry of the apartment six, what did you observe?

A We observed there was definitely a strong odor so we again donned our full protective ensemble, respiratory protection included, and we found there was multiple propane cylinders inside.  There was a glass pipe on the kitchen counter.  And as we systematically worked our way through the apartment, we noticed another individual in the rear apartment—or the rear bedroom of the apartment, excuse me.  So myself and firefighter Beck evacuated the building and advised the police officers that there was another individual inside the building for our own safety.

Q Now in addition to the propane cylinders and the other things you mentioned, did you observe any gas can in there?

A I do not recall.

Q But then upon seeing a person in the bedroom then you had police clear the rest of the apartment?

A That’s correct.

Q And upon clearing the apartment of that other individual then did you go back in?

A Yes, we did.

Q And then what, if anything, did you find?

A We started doing a more systematic approach because the odor was definitely prominent in that apartment again.  At that time we noticed the bathroom fan had an extension cord wire to it.  I don’t remember—it was very unusual in the bathroom.  The fan was wired with an extension cord and there was an unusual blue colored substance in the toilet and it was very strong in there, so I myself opened up the cabinet underneath the bathroom sink and found a glass container had an unknown product in it and it had a coffee filter sitting on top of the glass, and at that point I advised the police department.  I did not touch the evidence.

Q Did you then continue to go through the apartment trying to find the source of the odor?

A We made just a quick sweep through the back two bedrooms just to make sure there was nothing that we had missed, and then we advised the police department that it needed to be turned over to task force.

Q While you were clearing the apartment searching for the source of the odor or for potential flammable or explosive materials, was the police department personnel in the apartment?

A They were behind us, I believe, kind of right towards the entrance in the living room area.

Q Okay.  But that’s where they remained while you searched through the apartment?

A Yes.  And, like I said, it was a very offensive odor so they kind of stayed back a little bit so they could have the fresh air from the open door.

Q And so then you were able to complete your mission?

A Yes.

[¶21] Firefighter Bitz’s testimony reflects two key facts about the search of Huber’s apartment.  First, it reflects the firefighters were concerned with locating the odor’s source.  It was only during the course of this search that the methamphetamine lab and drug paraphernalia were discovered.  Second, Bitz’s testimony reflects the fact that law enforcement did not enter the apartment until they were asked to remove an occupant for safety purposes.  The officers also did not stop to independently look for evidence of a crime, and they remained separated from the firefighters as they continued their search.

[¶22] When it became apparent the responders were dealing with a methamphetamine lab, the dangers were exacerbated and law enforcement was justified in continuing to assist inside the apartment.  
See
 
United States v. Lloyd
, 396 F.3d 948, 955 (8th Cir.), 
cert denied
, 125 S. Ct. 2558 (2005) (“Our cases have recognized that dangers [from methamphetamine labs] may continue for some hours.”).  The dangers created by methamphetamine labs justify an immediate and ongoing search because of exigent circumstances due to these labs’ volatile nature.  
Id.
 at 954-55.  In 
Michigan v. Tyler
, 436 U.S. 499, 98 S. Ct. 1942 (1978), the United States Supreme Court upheld law enforcement’s reentry of a fire scene hours after their first entrance.  Law enforcement left the scene to allow visibility to improve and smoke and steam to dissipate.  
Id.
 at 502.  Holding the reentry was a continuation of the first entrance, the United States Supreme Court held it was a meaningless distinction that law enforcement had departed and returned rather than remain in the building the entire time:  “Little purpose would have been served by their remaining in the building, except to remove any doubt about the legality of the warrantless search and seizure later that same morning.”  
Id.
 at 511.  The continued presence of a methamphetamine lab is no less a danger than that posed by a smoldering fire.  Law enforcement’s presence in Huber’s apartment was at all times justified by the continuing emergency.

[¶23] The critical time for determining whether any exigency exists is the moment the warrantless entry is made.  
United States v. Reyes-Bosque
, 596 F.3d 1017, 1030 (9th Cir. 2010).  The actions and testimony of the emergency responders reflect they were concerned about dealing with an emergency when they entered Huber’s apartment.  The evidence of criminal activity was discovered during this emergency response and was not the motivating factor in the search of Huber’s apartment.  The district court could reasonably find the second requirement of the emergency exception was satisfied.

[¶24] The third requirement in the emergency exception test is that there must have been a reasonable basis, approximating probable cause, to associate the emergency with the area or place searched.  In 
Lubenow v. North Dakota State Highway Comm’r
, 438 N.W.2d 528, 533 (N.D. 1989), we adopted the current emergency exception test from 
People v. Mitchell
, 39 N.Y.2d 173, 347 N.E.2d 607 (1976).  In discussing the third requirement under the emergency exception test, the 
Mitchell
 court noted that an odor could form the necessary direct relationship between the area to be searched and the emergency.  
Id.
 at 610.

[¶25] The evidence and testimony reflect that the odor permeating the apartment building could logically be connected to Huber’s apartment.  The landlord testified he and the firefighters checked all units of the building to investigate for what he speculated might be a plugged sewer vent.  They had searched every other unit and had been unsuccessful in locating the source of the fumes by the time they reached Huber’s apartment.  Huber’s apartment, the last unit remaining to be checked, was a logical spot to check for the odor’s source.  The fact he had his windows open in sub-

zero temperatures only reinforced this conclusion.

[¶26] The relationship between the dangerous fumes and Huber’s apartment became obvious when he opened his door.  Acting under his retained right to enter an apartment in the case of an emergency, the landlord unlocked Huber’s door, which Huber immediately cracked open.  The emergency personnel present testified that the strong ammonia fumes were immediately apparent, and they were “pouring out of [the] apartment.”  Confronted with dangerous fumes and obvious evidence as to which unit they were coming from, there was a logical connection between the dangerous situation and Huber’s apartment.  The district court could reasonably find the third requirement was satisfied.  With all three requirements of the emergency exception satisfied, the district court could have reasonably concluded that the emergency exception to the Fourth Amendment warrant requirement applied in this case.

[¶27] We also note the action taken by law enforcement in this case to secure a search warrant after the initial entry, despite the existence of an emergency and exigent circumstances.  The Eighth Circuit Court of Appeals stated in 
Lloyd
, “The fact that [the officer] nevertheless went to obtain a search warrant shows the officers’ respect for the Fourth Amendment despite the exigent circumstances they encountered.”  396 F.3d at 954.  The permissibility of the officers’ actions in this case is reinforced by their obtaining a search warrant despite the ongoing emergency, an action which showed similar respect for the protections of the Fourth Amendment.

III

[¶28] “While the Fourth Amendment’s warrant requirement is the cornerstone of our protections against unreasonable searches and seizures, it is not a barrier to a police officer seeking to help someone in immediate danger.”  
People v. Molnar
, 98 N.Y.2d 328, 774 N.E.2d 738, 740 (2002).  The emergency responders in this case acted on a reasonable belief that the building’s occupants were in immediate danger.  The discovery of evidence without a warrant was justified under the emergency exception.  We affirm the district court’s criminal judgment.

[¶29] Dale V. Sandstrom

Gerald W. VandeWalle, C.J.

Crothers, Justice, specially concurring.

[¶30] I specially concur in the result reached by the majority.  I agree exigent circumstances allowed government officials to make a warrantless entry into Huber’s residence.  I also agree the multiple entries into this residence were lawful because of the nature and duration of the emergency and because, apparently, the only evidence seized was in plain view or related to the source of the emergency.  However, I am not confident the majority opinion is sufficiently clear on the need for a warrant once the emergency has dissipated or if the premises are to be searched beyond the scope of the emergency.  Without discussing the endpoint for the emergency and the beginning point for needing a warrant, I am concerned we are misleading governmental actors who are involved in these types of situations.

[¶31] The Court’s decision correctly notes, “The critical time for determining whether any exigency exists is the moment the warrantless entry is made.  
United States v. Reyes-Bosque
, 596 F.3d 1017, 1030 (9th Cir. 2010).”  Majority Opinion at ¶ 23.  However, 
Michigan v. Tyler
, 436 U.S. 499 (1978), also is cited for the proposition an emergency will justify “law enforcement’s reentry of a fire scene hours after their first entrance.”  Majority Opinion at ¶ 22.  I believe reliance on the quoted portions of the 
Michigan v. Tyler
 decision requires deeper consideration.

[¶32] First, Justice Stewart’s opinion in 
Michigan v. Tyler
 did not eliminate the need for search warrants after a fire.  To the contrary, the Court held:

“Thus, there is no diminution in a person’s reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman, or because his purpose is to ascertain the cause of a fire rather than to look for evidence of a crime, or because the fire might have been started deliberately.  Searches for administrative purposes, like searches for evidence of crime, are encompassed by the Fourth Amendment.  And under that Amendment, ‘one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is “unreasonable” unless it has been authorized by a valid search warrant.’”

436 U.S. at 506 (quotation omitted).

[¶33] Second, a valid warrantless entry does not constitute a passkey for endless subsequent reentry to the premises.  Rather, “once the emergency has dissipated, a search of the premises may not occur simply because the police are legitimately present.”  1 William E. Ringel, 
Searches & Seizures Arrests and Confessions
 § 10:8 (2d ed. 2010).

[¶34] Nor does a lawful emergency entry allow for unrestrained searches of the premises.  
See
 
Michigan v. Clifford
, 464 U.S. 287, 294-95 (1984) (“The object of the search is important even if exigent circumstances exist.  Circumstances that justify a warrantless search for the cause of a fire may not justify a search to gather evidence of criminal activity once that cause has been determined.  If, for example, the administrative search is justified by the immediate need to ensure against rekindling, the scope of the search may be no broader than reasonably necessary to achieve its end.  A search to gather evidence of criminal activity not in plain view must be made pursuant to a criminal warrant upon a traditional showing of probable cause.”) (footnote omitted).

[¶35] The time when an emergency has ended and a warrant is needed is inherently elastic and unclear, depending on the facts in each case.  
See
 
United States v. Coles
, 437 F.3d 361, 366 (3d Cir. 2006) (“The presence of exigent circumstances is a finding of fact.”).  This factually dependent inquiry makes it impossible to articulate a test for all circumstances, and I will not attempt to do so here.  Rather, I will join the majority’s appreciation of law enforcement’s “respect for the protections of the Fourth Amendment.”  Majority Opinion at ¶ 27.  I add only that that respect is not obviated by a lawful initial entry to handle an emergency.

[¶36] Daniel J. Crothers

Mary Muehlen Maring

Carol Ronning Kapsner