2017 ND 186

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Floyd Erik HYDE, Defendant and Appellant**

No. 20160437

Supreme Court of North Dakota.

Filed 7/31/2017

Ashley K. Schell, Assistant State's Attorney, Minot, N.D., for plaintiff and appellee.

Kyle R. Craig, Minot, N.D., for defendant and appellant.

Tufte, Justice.

[¶1] Floyd Hyde appeals a criminal judgment after entering a conditional plea of guilty to three drug charges. In his plea,

Hyde reserved his right to appeal the district court's denial of his motion to suppress evidence. Hyde argues the district court erred in finding the warrantless entry of his home fell within the emergency exception to the warrant requirement. We reverse and remand to allow him to withdraw his plea.

I

[¶2] Two Ward County deputies entered Hyde's residence in response to a report that he may be suicidal. At the time of their warrantless entry into Hyde's residence, the information available to the deputies included the following facts, about which there are no material conflicts in testimony. At 8:41 a.m. on May 13, 2015, Hyde's brother called the Ward County Sheriff's Department. He called the non-emergency dispatch line rather than 911. A dispatch log summarized the call as reporting that Hyde had "been calling his mother crying with suicidal ideations." The dispatch log also noted that Hyde's calls to his mother occurred "last night about a quarter to 01:00 hrs." The dispatcher recorded the request for a welfare check as "Status: Routine, Priority: Low." Deputy Olson testified as follows about the information she received from the dispatcher:

A What I remember is dispatch advising us that there was a welfare check, asked for welfare check. Brother called in for a welfare check and he had called his mother numerous times that night and had made suicidal comments.

Q Okay. In relationship to, I guess, the circumstances, though, there was no sort of direct quote from Mr. Hyde saying he per se was going to kill himself or anything like that that was relayed from dispatch to you, correct? It was just general sort of suicidal comments?

A Correct.

Q And there was no, nothing was relayed to you from dispatch that any sort of suicide was imminent such as Mr. Hyde standing on a ledge, sitting there with a gun to his head, or anything of that nature?

A No, sir.

[¶3] Deputy Olson testified that when she and another deputy arrived at Hyde's residence, she initially spoke to the landlord. The landlord told her that he had seen Hyde the night before. The landlord gave the deputies no indication that Hyde had shown any signs of distress. He went on to say that if a gold SUV was in the driveway, Hyde was probably home. The SUV was parked in the driveway. The landlord also said he believed Hyde was asleep. Starting at 10:20 a.m., the deputies began knocking on the door. After approximately nine minutes of knocking repeatedly without an answer, the deputies entered Hyde's residence through the unlocked door.

[¶4] Upon entering the residence, the deputies checked the living room and two bedrooms for Hyde. In the first bedroom, the deputies did not see Hyde, but they did see a marijuana plant on the floor. The deputies located Hyde asleep in the second bedroom. One deputy shook Hyde to wake him. To the deputy, Hyde seemed very groggy. Hyde told the deputies that he had taken a sleeping pill the night before. The deputy inquired into Hyde's mental health. Hyde acknowledged that he was having a rough time, but he was not suicidal and would be okay. The deputy advised Hyde that she needed to confiscate the marijuana plant she saw in the first bedroom. Hyde agreed and told her she could have all of the plants. Hyde then showed the deputy where he had additional marijuana plants. Based on the information obtained during the initial warrantless entry, a search warrant was obtained. The depu-

ties' search of Hyde's home yielded bagged marijuana, thirty-five marijuana plants, and marijuana paraphernalia.

[¶5] Hyde was charged with manufacturing marijuana, possession of drug paraphernalia, and possession of a controlled substance. Hyde brought a motion to suppress the evidence found after the deputies entered his residence without a warrant. The district court denied the motion. Hyde entered a conditional plea of guilty on the charges. On appeal, Hyde argues the district court erred in denying his motion to suppress, because the deputies did not have a warrant to enter his house and there were no exigent circumstances or emergency to justify their warrantless entry.

## II

[¶6] Our standard for reviewing a district court's decision on a motion to suppress is well established:

> [W]e give deference to the district court's findings of fact and we resolve conflicts in testimony in favor of affirmance. *State v. Tognotti*, 2003 ND 99, ¶ 5, 663 N.W.2d 642. We "will not reverse a district court decision on a motion to suppress . . . if there is sufficient competent evidence capable of supporting the court's findings, and if the decision is not contrary to the manifest weight of the evidence." *State v. Gefroh*, 2011 ND 153, ¶ 7, 801 N.W.2d 429. Questions of law are fully reviewable on appeal, and whether a finding of fact meets a legal standard is a question of law. *Id.*

*State v. Reis*, 2014 ND 30, ¶ 8, 842 N.W.2d 845.

[¶7] The Fourth Amendment to the United States Constitution and Art. I, § 8, of the North Dakota Constitution protect individuals against unreasonable searches and seizures. Warrantless searches of homes are presumptively un-

reasonable. *State v. Stewart*, 2014 ND 165, ¶ 12, 851 N.W.2d 153. A warrantless search is not constitutionally unreasonable if an exception to the search warrant requirement, such as exigent circumstances, applies. *Id.* We have defined exigent circumstances as "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." *State v. Nagel*, 308 N.W.2d 539, 543 (N.D. 1981) (quoting *State v. Page*, 277 N.W.2d 112, 117 (N.D. 1979)).

[¶8] We have referred to this warrant exception both as exigent circumstances and as the emergency exception. *State v. Stewart*, 2014 ND 165, ¶ 13, 851 N.W.2d 153 (citing *State v. Matthews*, 2003 ND 108, ¶ 27, 665 N.W.2d 28). Exigent circumstances commonly refers to situations in which law enforcement suspects criminal activity but there is "no time for them to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). The emergency exception may be considered a subset of exigent circumstances in which law enforcement has an objectively reasonable basis to believe someone is "seriously injured or threatened with such injury." *Michigan v. Fisher*, 558 U.S. 45, 47-48, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006)). To the extent the analysis is distinct, the search of Hyde's home presents an application of the emergency exception and not exigent circumstances. *Huber*, 2011 ND 23, ¶ 13, 793 N.W.2d 781.

[¶9] The emergency exception "does not require probable cause [of a crime] but must be actually motivated by a perceived need to render aid or assistance." *State v. Huber*, 2011 ND 23, ¶ 13,

793 N.W.2d 781 (quoting *State v. Matthews*, 2003 ND 108, ¶ 13, 665 N.W.2d 28). Three requirements must be met to apply the emergency exception:

(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

(2) The search must not be primarily motivated by intent to arrest and seize evidence.

(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

*Stewart*, 2014 ND 165, ¶ 13, 851 N.W.2d 153. The burden is on the State to prove that each of these three requirements existed at the time of the warrantless entry into a home. *State v. DeCoteau*, 1999 ND 77, ¶ 14, 592 N.W.2d 579.

 [¶10] On appeal, Hyde challenges only whether the State proved the first requirement. Therefore, the issue is whether law enforcement had reasonable grounds to believe an emergency existed which required "an immediate need for their assistance for the protection of life or property." *Stewart*, 2014 ND 165, ¶ 13, 851 N.W.2d 153.

 ▪ [¶11] For the first requirement, we apply an objective standard of reasonableness: "would the facts available to the officer at the moment of [the entry] warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Matthews*, 2003 ND 108, ¶ 33, 665 N.W.2d 28 (quoting *Root v. Gauper*, 438 F.2d 361, 364-65 (8th Cir. 1971) (internal quotation marks omitted)). An officer's belief that an emergency exists "must be grounded in empirical facts rather than subjective feelings." *Matthews*, at ¶ 29 (quoting *People v. Mitchell*, 39 N.Y.2d 173,

383 N.Y.S.2d 246, 347 N.E.2d 607, 609-10 (1976)).

 [¶12] The exigent circumstances exception normally applies when officers have an urgent need to act and there is no time to get a warrant. *State v. Morales*, 2015 ND 230, ¶ 11, 869 N.W.2d 417 (citing *Missouri v. McNeely*, 569 U.S. 141, 133 S.Ct. 1552, 1558-59, 185 L.Ed.2d 696 (2013)). The deputies' concern here was entirely premised on the report of suicidal comments. Unassisted suicide and attempted suicide have not been criminal offenses since Chapter 12-33, N.D.C.C., was repealed in 1973. Because there was no reason to suspect criminal activity in Hyde's home, consideration of whether there was time to get a warrant is inapplicable to these circumstances. N.D.R.Crim.P. 41(b). The parties do not dispute that the deputies' intent in entering Hyde's residence was to protect him from harm.

[¶13] The emergency exception may be traced back to U.S. Supreme Court dictum suggesting a warrant may not be required " 'where the officers, passing by on the street, hear a shot and a cry for help and demand entrance in the name of the law.' " *Root v. Gauper*, 438 F.2d 361, 364 (8th Cir.1971) (quoting *McDonald v. United States*, 335 U.S. 451, 454, 69 S.Ct. 191, 93 L.Ed. 153 (1948)). This early characterization provides guidance as to what degree of urgency satisfies the "immediate need" for assistance required by the emergency exception.

[¶14] Our cases applying the emergency exception have relied upon direct and contemporaneous observations to establish an immediate need for assistance to protect life or property. *State v. Nelson*, 2005 ND 11, ¶ 15, 691 N.W.2d 218 (remanding for factual determination of whether conflicting testimony regarding an apparent asthma attack in the officer's presence consti-

tuted an emergency sufficient to justify an officer's search for an inhaler); *Lubenow v. N.D. State Highway Comm'r*, 438 N.W.2d 528, 533 (N.D. 1989) (holding search of garage was within emergency exception where officer personally observed a body lying on the floor next to a car); *State v. Matthews*, 2003 ND 108, ¶¶ 4, 38-40, 665 N.W.2d 28 (applying emergency exception to search of house 30-45 minutes after family member called 911 with report of two men being held at gunpoint); *State v. Huber*, 2011 ND 23, ¶¶ 16-17, 793 N.W.2d 781 (affirming application of emergency exception where officer smelled strong chemical fumes coming from an apartment).

[¶15] Other courts have rejected application of the emergency exception where there was insufficient immediacy. In *People v. Davis*, the Michigan Supreme Court applied the *Mitchell* three-factor test to reject application of the emergency doctrine to a search of a motel room. 442 Mich. 1, 497 N.W.2d 910, 918 (1993) (quoting *People v. Mitchell*, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607 (N.Y. 1976)). Responding to a dispatch that a hotel manager had heard gunfire in one of two motel rooms, officers arrived at the hotel. *Id.* at 921. The report referenced a possible witness but contained little other detail and did not directly indicate that someone was injured. *Id.* The officers did not personally hear shots or observe anything at the hotel to support a conclusion that someone was injured or in need of immediate aid. *Id.* The officers knocked and became suspicious when the occupant "took several minutes to open the door." *Id.* ("The mere fact that she delayed in opening the door does not, in our judgment, support a reasonable belief that a person within the room was in need of immediate aid."). Ultimately, the court concluded that the emergency exception did not allow officers to "forc[e] entry into a dwelling on the basis of a specula-tion that someone inside may have been injured." *Id.*

[¶16] Resolving a claim of qualified immunity in *Sutterfield v. City of Milwaukee*, the Seventh Circuit extensively discussed application of the emergency exception to suicidal threats. 751 F.3d 542, 557-59 (7th Cir. 2014). In *Sutterfield*, the Milwaukee police received a 911 call from a treating physician regarding a patient. The patient had just left the physician's office after remarking, "I guess I'll go home and blow my brains out." 751 F.3d at 545. The patient had worn an empty gun holster to the appointment. *Id.* Unable to locate the patient for several hours, the officers pursued a statutory procedure for emergency detention based on a substantial probability of physical harm as manifested by evidence of recent threats of or attempts at suicide. *Id.* at 545-46. This procedure is similar to North Dakota's emergency treatment procedure set forth in N.D.C.C. § 25-03.1-25. Nearly nine hours after the initial 911 call, officers found the patient at home, and the patient refused them entry. *Id.* at 546-47. They forcibly entered the home and took her into custody. *Id.* at 547.

[¶17] Both here and in *Sutterfield*, approximately nine hours passed between the initial report and the warrantless entry. In contrast to the specific information presented to the *Sutterfield* officers, the information about Hyde was farther removed, was not a specific threat, and did not come from a treating physician. In *Sutterfield*, the court found the officers' entry objectively reasonable, relying on the officer's compliance with the statutory emergency detention procedure as well as the specificity and source of the suicidal threats. The record here does not indicate whether any consideration was given to the emergency treatment procedure available under N.D.C.C. § 25-03.1-25 to pro-

vide involuntary treatment to those at risk of suicide.

[¶18] Hyde argues the district court erred in relying on a vague report of suicidal comments from the previous evening in finding reasonable grounds to believe that there was an emergency at hand. In denying Hyde's suppression motion, the district court stated:

> In this instance, the exigent circumstances exception does come into play. The officers believed Hyde may harm himself (or already had harmed himself) and needed assistance. ... They were told by others in the community that if Hyde's vehicle was parked outside the home, he'd be there. The officers observed the vehicle, and entered the home knowing Hyde was present, and began the search which turned up the evidence, and then Hyde. All three requirements for the exigent circumstances exception have been met.

[¶19] As we explain below, the record shows the evidence available to the deputies at the time of the search did not establish reasonable grounds to believe there was an emergency and an immediate need for assistance to protect Hyde's life. In combination, the lack of reliability, the vagueness of the information, and the delay in response lead us to conclude that the district court's application of the emergency exception was against the manifest weight of the evidence.

[¶20] First, the information available to the officers was not on its face reliable in that its source was remote and the officers had no first-hand corroboration. The call to the dispatcher was from Hyde's brother. Coming from a family member, the source of the information does not raise questions, but the information conveyed was that "suicidal comments" were made to someone else, Hyde's mother. By the time it reached the deputies, they knew the information had passed through multiple people. Hyde spoke to his mother, who told his brother, who told the dispatcher, who told the responding deputies. As in the telephone game played by children, the more people in the chain, the greater the likelihood that the message will change despite the best efforts to accurately pass on an accurate message. *The Free Dictionary by Farlex,* Telephone (game) (July 21, 2017) http://www.thefreedictionary.com/ Telephone + (game); *see also United States v. Gonzalez,* 2010 WL 2721882, *7 fn 12 (N.D. Ga. 2010). Even between what the dispatcher wrote in the log ("crying" and "suicidal ideations") and what the deputy heard from the dispatcher ("just general sort of suicidal comments"), there is a loss of detail and change in emphasis. The record does not tell us what detail may have been lost or changed between Hyde's original statement to his mother and what his brother told the dispatcher. Nothing the officers directly observed corroborated the comments. To the contrary, the landlord's comments that Hyde did not seem distressed the night before contradicted the information from Hyde's brother.

[¶21] Second, the report of "suicidal comments" is vague and lacks sufficient detail to support a reasonable basis to believe there was an ongoing emergency. Suicidal comments may indicate an imminent likelihood of a suicide attempt, but they may not. The deputies were not informed about a weapon or specific threat, nor were they told a suicide attempt was imminent. The district court simply found "[t]he officers believed Hyde may harm himself (or already had harmed himself) and needed assistance." The district court did not explain what details led it to conclude that any assistance Hyde may have needed was required immediately. The court did not specifically find a need for immediate assistance, only that Hyde

"needed assistance." Our cases require a need for <u>immediate</u> assistance to sidestep the warrant requirement, not merely a need for assistance.

[¶22] Third, the more than nine-hour delay between the comments and the search weighs against a finding there was an immediate need for assistance. The responding deputies reasonably would want to ensure Hyde had not followed through with his suicidal comments. Every emergency ends at some point. If there was an emergency when Hyde called his mother, the passage of time substantially reduced the likelihood there remained an immediate need for assistance nine hours later. *See Sutterfield v. City of Milwaukee*, 751 F.3d 542, 561 (7th Cir. 2014). ("at some point, the passage of time will undermine the notion that emergency aid was required").

[¶23] The record shows no one treated these comments as an emergency. Hyde's calls to his mother were about 12:45 a.m. The record does not show that she called anyone for help other than informing Hyde's brother. It is unclear whether she called Hyde's brother immediately or waited until the next morning. Hyde's brother called the non-emergency dispatch line at 8:34 the next morning. The dispatcher who took the call from Hyde's brother categorized the matter not as an emergency but as "Status: Routine, Priority: Low."

[¶24] The responding deputies arrived at Hyde's residence shortly before 10:20 a.m. Rather than rush into the house to render immediate assistance, they first spoke to Hyde's landlord. The deputies began knocking repeatedly on the door at 10:20 a.m. The deputies reasonably believed Hyde was home. Such insistent knocking at that time would prompt most people to answer the door. But there is no obligation to answer a knock at the door. The fact that the deputies knocked for nine minutes before entering also tends to show they lacked a genuinely reasonable belief there was an emergency. "[W]ait[ing] outside for several minutes ... is not consistent with that of a man who believes that wounded persons might be lying inside the house awaiting attention." *Root v. Gauper*, 438 F.2d 361, 365 (8th Cir.1971). That an officer stops to knock does not preclude a finding of emergency; however, each additional delay lends more weight to the conclusion that any need for assistance is not an immediate need. *State v. Matthews*, 2003 ND 108, ¶ 35, 665 N.W.2d 28 ("In upholding that an emergency exception exists, some courts have limited the doctrine and held some situations automatically fall outside its scope, such as a delayed response to the emergency....") (citing *Root*, 438 F.2d at 365).

[¶25] For these reasons, we conclude the district court's application of the emergency exception was against the manifest weight of the evidence.

## III

[¶26] We reverse the district court judgment and remand to allow Hyde to withdraw his plea.

[¶27] Jerod E. Tufte

Daniel J. Crothers

Carol Ronning Kapsner

VandeWalle, Chief Justice, dissenting.

[¶28] I respectfully dissent.

[¶29] The majority relies heavily upon two cases from outside our jurisdiction: *People v. Davis*, 442 Mich. 1, 497 N.W.2d 910 (1993) and *Sutterfield v. City of Milwaukee*, 751 F.3d 542 (7th Cir. 2014). In *Sutterfield*, a patient made suicidal comments to her doctor. 751 F.3d at 545. As the majority points out, it took officers approximately nine hours to locate the pa-

tient. *Id.* at 546-47. When the officers did locate the patient, she refused them entry into her home, but nonetheless, the officers forced their way into the patient's home. *Id.* This is not insignificant; law enforcement officers were able to confirm that the patient had not followed through with her threat of suicide because the patient had answered the door. However, here, the deputies were not able to confirm that Hyde did not act on his suicidal comments; Hyde never came to the door nor did the deputies observe any indication of movement inside the residence throughout their nine minutes of knocking and yelling.

[¶30] In *Davis*, the Michigan Supreme Court found there was not an emergency situation when law enforcement received an ambiguous report of shots being fired from one of two motel rooms and the individual in the first motel room took several minutes to open the door. 497 N.W.2d at 921-22. The court noted the caller claimed to be the manager of the motel, but gave the wrong name of the motel and was unable to give its address or the cross street. *Id.* at 922. The court also noted the report of shots being fired did not "suggest that any person was injured." *Id.* at 921.

[¶31] We have stated "information from an informant whose identity is easily ascertainable has a higher indicia of reliability than information obtained from a purely anonymous informant." *State v. Karna*, 2016 ND 232, ¶ 9, 887 N.W.2d 549 (citing *Anderson v. Dir., N.D. Dep't of Transp.*, 2005 ND 97, ¶ 15, 696 N.W.2d 918). Here, the report to law enforcement came from Hyde's brother and he reported Hyde called their mother numerous times the previous night where he made several suicidal comments. This information from Hyde's brother has a higher indicia of reliability because it was not from a purely anonymous informant; rather, it came from

a family member who identified himself to law enforcement. Additionally, as in *Sutterfield*, Davis answered the door to law enforcement's knocking and announcing and forced their way into the motel room. 497 N.W.2d at 922. Although it is true that Davis could have been concealing a person in need of aid, law enforcement was able to observe Davis's demeanor and had the opportunity to question her about the reported shots. No such interaction was possible here; no one answered the door to Hyde's residence. Indeed, had Hyde come to the door, I would have joined in the majority's opinion.

[¶32] With the facts available to the deputies at the time of their entry into Hyde's residence—a family member reporting Hyde was suicidal, Hyde was likely at his residence, and there was no response to the deputies knocking for nine minutes—I believe a reasonable person would conclude the deputies' entrance into Hyde's residence was appropriate to ensure Hyde had not followed through with his suicidal comments. At the time the deputies entered Hyde's residence, they could not have known whether he had carried through with his suicidal comments. Therefore, the deputies had reasonable grounds to believe that there was an emergency at hand and there was an immediate need for their assistance to protect Hyde's life when they entered Hyde's residence.

[¶33] Because I believe the district court correctly determined the deputies reasonably believed Hyde was in immediate need of aid to preserve his life, I would affirm.

[¶34] Gerald W. VandeWalle, C.J.