# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

## 2019 ND 300

State of North Dakota,                                    Plaintiff and Appellee

  v.

Kerry Charles Komrosky,                               Defendant and Appellant

## No. 20190065

Appeal from the District Court of Burleigh County, South Central Judicial District, the Honorable John W. Grinsteiner, Judge.

AFFIRMED.

Opinion of the Court by VandeWalle, Chief Justice.

Ladd R. Erickson, Burleigh County Special Assistant State's Attorney, Washburn, ND, for plaintiff and appellee.

Michael R. Hoffman, Bismarck, ND, for defendant and appellant.

**VandeWalle, Chief Justice.**

[¶1] Kerry Komrosky appealed a criminal judgment after entering a conditional plea of guilty to three drug-related charges. In his plea, Komrosky reserved his right to appeal the district court's denial of his motion to suppress evidence. Komrosky argues the district court erred in finding the warrantless entry into his home fell within the emergency exception to the warrant requirement and the evidence seized was in plain view. We affirm.

I

[¶2] Kerry Komrosky was a patrol deputy with the Burleigh County Sheriff's Department. On April 7, 2018, Komrosky was working a day shift with the Department. On the morning of his shift, Komrosky asked his supervisor, Sergeant Nathan McLeish, if he could take an extended lunch break. McLeish allowed Komrosky to take an extended two-hour break.

[¶3] At 2:35 p.m., Komrosky checked out with a dispatcher at his residence in Lincoln, North Dakota, on his lunch break. At 4:40 p.m., after the dispatcher was unable to reach Komrosky on his radio and his cell phone, the dispatcher informed McLeish that Komrosky had not yet checked back in from his break. McLeish was near United Tribes Technical College at the time, only a couple of miles away from Komrosky's residence. Komrosky had recently been having issues with work conduct including arriving late to work and not arriving to work at all. Because Komrosky was recently having issues with work conduct, McLeish informed the dispatcher that Komrosky probably just had his radio turned off, like he had in the past, but that he would go to Komrosky's residence to check on him. McLeish then left United Tribes College and drove to Komrosky's residence. On the way, McLeish attempted to contact Komrosky on his radio several times but did not get a response.

[¶4]   When McLeish arrived, he parked in the driveway next to Komrosky's residence. Komrosky's squad car was parked parallel to the garage door connected to the residence. The driver's door was slightly ajar, the car was running, and it was unlocked. At the suppression hearing, McLeish testified that Komrosky's squad car should have been turned off and locked having been parked for such an extended period of time. McLeish did not notice anybody around, so he began banging on the garage door. After getting no response, McLeish went to the front door and knocked on the front door several times. While knocking, Komrosky's dogs inside his home were barking and jumping and making a lot of commotion. McLeish repeatedly shouted for Komrosky to come out and knocked on the door for five or six minutes without any response from Komrosky. McLeish then checked the garage door one more time. After still not getting a response, McLeish entered Komrosky's residence through the front door. After entering, McLeish stood in the entryway for several minutes yelling Komrosky's name and for him to come downstairs. McLeish received no response. During this time, the dogs continued to bark.

[¶5]   McLeish made his way to a stairway in the residence. At the suppression hearing, McLeish testified that the dogs were leading him towards the stairs. McLeish also testified that he was scared and nervous because he wasn't getting a response from Komrosky and wasn't sure what he was walking into. McLeish was concerned that Komrosky may have done something to himself because he was "in a dark place" at the time. Komrosky had recently lost his "dream job" on the Metro Area Narcotics Task Force.

[¶6]   McLeish walked up the stairs to a landing that turned and led to the second floor of the residence. Before turning to go to the second floor, McLeish radioed Deputy Weigel for backup. McLeish could hear his voice being broadcast in the house through Komrosky's radio. McLeish proceeded up the stairs to the second floor of Komrosky's home. On the second floor, McLeish noticed that the furniture was torn up and there were parts and pieces of furniture on the floor. McLeish made his way around the second floor, making sure Komrosky was not there.

2

[¶7]   McLeish went up the next flight of stairs towards the third floor. At the top of the stairs, there was a landing that turned and faced a hallway on the third floor. McLeish testified that the dogs were standing on the landing looking down the hallway. The dogs would repeatedly turn and look at McLeish and then look back down the hallway. Continuing to shout for Komrosky, McLeish made his way to the landing. After making his way to the top of the stairs, McLeish quickly looked around the corner. Komrosky came out from a room on the right-hand side of the hallway. McLeish testified that Komrosky looked "disheveled," his hair was a mess, his pants were undone, and his shirt was untucked. Komrosky then walked into a different room across the hall. McLeish told Komrosky to get his gear and meet him downstairs.

[¶8]   After making contact with Komrosky, McLeish returned downstairs and waited for Komrosky in the entryway on the first floor. While waiting in the entryway, McLeish noticed a broken light bulb laying in the corner. McLeish testified that the broken bulb looked out of place. McLeish walked over and looked down at the bulb. He looked up and saw that the light in the entryway was on. McLeish opened the garage access door and saw the two lights in the garage were also on. McLeish did not see any broken or missing bulbs. McLeish bent over to take a closer look at the broken bulb and noticed it had a milky white residue on the inside of the glass. McLeish immediately recognized the broken bulb as a meth pipe.

[¶9]   McLeish got his cell phone and took pictures of the bulb and Komrosky's residence with his phone. After taking the pictures, McLeish took a piece of the broken glass. McLeish later conducted a field test on the glass, and the test came back presumptively positive for methamphetamine. Subsequently, McLeish applied for and was issued a search warrant for Komrosky's residence where other contraband, including methamphetamine and drug paraphernalia, was seized.

II

[¶10] Our standard for reviewing a district court's decision on a motion to suppress evidence is well established:

[W]e give deference to the district court's findings of fact and we resolve conflicts in testimony in favor of affirmance. *State v. Tognotti*, 2003 ND 99, ¶ 5, 663 N.W.2d 642. We "will not reverse a district court decision on a motion to suppress . . . if there is sufficient competent evidence capable of supporting the court's findings, and if the decision is not contrary to the manifest weight of the evidence." *State v. Gefroh*, 2011 ND 153, ¶ 7, 801 N.W.2d 429. Questions of law are fully reviewable on appeal, and whether a finding of fact meets a legal standard is a question of law. *Id.*

*State v. Hyde*, 2017 ND 186, ¶ 6, 899 N.W.2d 671 (citing *State v. Reis*, 2014 ND 30, ¶ 8, 842 N.W.2d 845).

## III

[¶11] Under the Fourth Amendment of the United States Constitution and Art. I, § 8, of the North Dakota Constitution, warrantless searches of homes are presumptively unreasonable. *State v. Stewart*, 2014 ND 165, ¶ 12, 851 N.W.2d 153. However, a warrantless search is not constitutionally unreasonable if an exception to the warrant requirement, such as exigent circumstances, applies. *Id.* We have defined exigent circumstances as "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." *State v. Nagel*, 308 N.W.2d 539, 543 (N.D. 1981) (quoting *State v. Page*, 277 N.W.2d 112, 117 (N.D. 1979)).

[¶12] We have referred to this warrant exception both as exigent circumstances and as the emergency exception. *Stewart*, 2014 ND 165, ¶ 13, 851 N.W.2d 153 (citing *State v. Matthews*, 2003 ND 108, ¶ 27, 665 N.W.2d 28). "Exigent circumstances commonly refers to situations in which law enforcement suspects criminal activity but there is 'no time for them to secure a warrant.'" *State v. Hyde*, 2017 ND 186, ¶ 8, 899 N.W.2d 671 (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)). "The emergency exception may be considered a subset of exigent circumstances in which law enforcement has an objectively reasonable basis to believe someone is 'seriously injured or threatened with such injury.'" *Hyde*, at ¶ 8 (quoting

*Michigan v. Fisher*, 558 U.S. 45, 47-48 (2009)). To the extent the analysis is distinct, the search of Komrosky's home presents an application of the emergency exception and not exigent circumstances. *See State v. Huber*, 2011 ND 23, ¶ 13, 793 N.W.2d 781.

[¶13] The emergency exception "does not require probable cause [of a crime] but must be actually motivated by a perceived need to render aid or assistance." *State v. Hyde*, 2017 ND 186, ¶ 9, 899 N.W.2d 671 (quoting *Huber*, 2011 ND 23, ¶ 13, 793 N.W.2d 781). Three requirements must be met for the emergency exception to apply:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.
>
> (2) The search must not be primarily motivated by intent to arrest and seize evidence.
>
> (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

*Stewart*, 2014 ND 165, ¶ 13, 851 N.W.2d 153. The burden is on the State to prove that each of these three requirements existed at the time of the warrantless entry into a home. *State v. DeCoteau*, 1999 ND 77, ¶ 14, 592 N.W.2d 579.

[¶14] On appeal, Komrosky only challenges whether McLeish had reasonable grounds to believe there was an emergency at hand and an immediate need for his assistance for the protection of life or property. *See Stewart*, 2014 ND 165, ¶ 13, 851 N.W.2d 153. For the first requirement, we apply an objective standard of reasonableness: "would the facts available to the officer at the moment of [the entry] warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Hyde*, 2017 ND 186, ¶ 11, 899 N.W.2d 671 (quoting *Matthews*, 2003 ND 108, ¶ 33, 665 N.W.2d 28). An officer's belief that an emergency exists "must be grounded in empirical facts rather than subjective feelings." *Matthews*, at ¶ 29. Our cases applying

the emergency exception have relied upon direct and contemporaneous observations to establish an immediate need for assistance to protect life or property. *Hyde*, at ¶ 14 (and cases cited therein). Factors we have considered include the lack of reliability and vagueness of the information provided to law enforcement, the delay in response by law enforcement, and observations by law enforcement at the scene. *See id.* at ¶¶ 19-22; *State v. Karna*, 2016 ND 232, ¶ 10, 887 N.W.2d 549; *Stewart*, 2014 ND 165, ¶ 14, 851 N.W.2d 153; *State v. Morin*, 2012 ND 75, ¶ 10, 815 N.W.2d 229; *State v. Mitzel*, 2004 ND 157, ¶¶ 22-23, 685 N.W.2d 120; *DeCoteau*, 1999 ND 77, ¶¶ 17-18, 592 N.W.2d 579; *City of Fargo v. Ternes*, 522 N.W.2d 176, 178 (N.D. 1994).

[¶15] Komrosky argues that *State v. Hyde* is dispositive of this case. In *Hyde*, law enforcement officers entered Hyde's residence in response to a report that Hyde may be suicidal. 2017 ND 186, ¶ 2, 899 N.W.2d 671. At 8:41 a.m. Hyde's brother had called the Ward County Sheriff's Department on the non-emergency dispatch line, rather than calling 911, to report that eight hours prior, at about 12:45 a.m., Hyde had "been calling his mother crying with suicidal ideations." *Id.* The dispatcher had recorded the request for a welfare check as "Status: Routine, Priority: Low." *Id.* Nearly two hours after Hyde's brother called, police deputies went to Hyde's residence to conduct a welfare check. *Id.* at ¶ 3. The deputies first talked to Hyde's landlord, who stated that he had seen Hyde the night before and there was no indication that Hyde had shown any signs of distress. *Id.* The deputies then began knocking on the door to Hyde's residence. *Id.* After knocking for nine minutes repeatedly without an answer, the deputies entered Hyde's residence through the unlocked door. *Id.* Upon entering the residence and searching for Hyde, the deputies found a marijuana plant on the floor of a bedroom. *Id.* at ¶ 4.

[¶16] A majority of this Court held the evidence available to the deputies at the time of entry did not establish reasonable grounds to believe there was an emergency and an immediate need for assistance to protect Hyde's life. *Id.* at ¶ 19. First, the information available to the officers was remote, and the officers had no first-hand corroboration. *Id.* at ¶ 20. Nothing the officers

6

directly observed corroborated Hyde's alleged "suicidal comments." *Id.* To the contrary, the landlord's comments that Hyde did not seem distressed contradicted the information from Hyde's brother. *Id.* Second, the report of "suicidal comments" was vague and lacked sufficient detail to support a reasonable belief that there was an ongoing emergency. *Id.* at ¶ 21. The deputies were not informed about a weapon or specific threat, nor were they told a suicide attempt was imminent. *Id.* As this Court reemphasized, there must be an *immediate* need for assistance for the warrant exception to apply. *Id.* Third, the delay in reporting the comments to law enforcement and the delay in response by the deputies show that no one treated Hyde's comments as an emergency. *Id.* at ¶ 22. The passage of time in reporting Hyde's comments, response by law enforcement, and entry into Hyde's home substantially reduced the likelihood there remained an immediate need for assistance. *Id.*

[¶17] *Hyde* is distinguishable from the facts of this case. McLeish had a reasonable basis to believe that there was an ongoing emergency before entering Komrosky's home. The district court found that McLeish was concerned Komrosky may have been ambushed or that Komrosky may have harmed himself. McLeish's concerns stemmed from Komrosky's role as a police officer and from McLeish's first-hand concerns about Komrosky's mental state. Komrosky had recently lost his "dream job" on the Metro Area Narcotics Task Force, and McLeish believed that Komrosky was in a "dark place" at the time. The district court found that being a police officer is an inherently dangerous job that can be mentally and emotionally taxing. *See Karna*, 2016 ND 232, ¶ 11, 887 N.W.2d 549. Police officers are exposed to dangerous situations and people who may want to hurt them on a daily basis. These findings provide a reasonable basis to believe that there was an ongoing emergency.

[¶18] McLeish was not relying on information from a remote source; his observations were direct. After several attempts, Komrosky was unreachable by a dispatcher or McLeish after his extended lunch break. Upon arrival, McLeish observed Komrosky's patrol vehicle parked parallel to his garage with the keys in the ignition and the vehicle running, and with

the driver's door ajar and unlocked. This was contrary to standard practice that an officer keep their patrol vehicle, which contains numerous firearms and electronics, secured or turned off if not being used for extended periods of time. McLeish's concern was further heightened after knocking on Komrosky's garage door and front door, ringing the doorbell, and yelling Komrosky's name for several minutes with no answer or response. Komrosky's dogs were also jumping and barking. Despite the considerable noise and repeated attempts to make contact, neither McLeish nor the dispatcher were able to contact Komrosky.

[¶19] There was also no delay in response. In *Hyde*, the Court reasoned that the deputies knocking for several minutes before entering the residence showed the deputies lacked a genuinely reasonable belief there was an emergency. *Id.* at ¶ 24. However, we stated that knocking does not preclude a finding of emergency, but that each additional delay lends more weight to the conclusion that any need for assistance is not an immediate need. *Id.* Unlike the deputies in *Hyde*, McLeish responded immediately after learning Komrosky had not reported back from his extended lunch period. After he was unable to make contact with Komrosky, McLeish treated the situation as an emergency. He did not speak to anyone else or wait for an extended period before entering Komrosky's residence to check on his well-being. There was no significant or meaningful delay in time from when McLeish began to knock to when he entered Komrosky's residence. Given McLeish's other observations, McLeish's knocking for several minutes before entry does not preclude McLeish from reasonably believing that there was an ongoing emergency or a need to render immediate assistance.

[¶20] Based on empirical facts, there were reasonable grounds for McLeish to believe there was an emergency at hand and an immediate need for his assistance. McLeish's direct and contemporaneous observations support McLeish's entry into Komrosky's home. McLeish's entry was justified under the emergency exception to the warrant requirement.

8

## IV

[¶21] In the alternative, Komrosky argues that McLeish exceeded the scope of the emergency by staying in Komrosky's residence after he made contact with Komrosky and, therefore, the evidence seized was not in plain view. This Court has never explicitly declared when a search invoked under the emergency exception must end. However, in one of the first cases this Court decided discussing the emergency exception, Justice Levine, writing separately, stated: "The emergency exception . . . must be strictly construed to keep the intrusion as limited as possible . . . . After the emergency has ended, so too does the right to search without a warrant." *Lubenow v. N.D. State Highway Comm'r*, 438 N.W.2d 528, 533-34 (N.D. 1989) (Levine, J., concurring specially). Even at its inception, the concern with the emergency exception was additional warrantless searches stemming from law enforcement's intrusion justified under the exception.

[¶22] McLeish did not conduct an additional search after making contact with Komrosky. He stood in the entryway and waited for Komrosky to come downstairs. Such an act is not one that constitutes an additional search or exceeds the scope of the emergency exception.

[¶23] Under the plain view doctrine, if law enforcement officers are lawfully in a position from which they view an object, whose incriminating character is immediately apparent, and the officers have a lawful right of access to the object, they may seize it without a warrant. *State v. Wamre*, 1999 ND 164, ¶ 16, 599 N.W.2d 268 (citing *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *Horton v. California*, 496 U.S. 128, 135-36 (1990)). Officers may seize contraband or evidence of a crime that is in plain view during a warrantless search if "the items are not items for which the searching officer had probable cause to believe were in the area being searched." *State v. Kottenbroch*, 319 N.W.2d 465, 471 (N.D. 1982); *see State v. Huber*, 2011 ND 23, ¶ 19, 793 N.W.2d 781. An officer's initial intrusion must be supported by one of the recognized exceptions to the warrant requirement, and the discovery must be inadvertent and within the proper scope of the search. *Id.* A law enforcement officer need not be certain that a substance is

contraband before he may seize it and submit it for testing so long as the officer lawfully views the property and there is probable cause to associate the property with criminal activity. *State v. Gelvin*, 318 N.W.2d 302, 307 (N.D. 1982).

[¶24] The facts in *Arizona v. Hicks* are analogous to the facts of this case. 480 U.S. 321 (1987). In *Hicks*, officers entered an apartment under the exigent circumstances exception to the warrant requirement. *Id.* at 323. Once in the apartment, officers examined stereo equipment they suspected might be stolen. *Id.* The officers moved the stereo equipment to obtain the serial numbers. *Id.* The Supreme Court held that the movement of the stereo equipment to inspect the serial numbers was a search that required independent probable cause. *Id.* at 325-26 ("[T]aking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry."). In interpreting *Hicks*, we have stated: "Under *Hicks*, even an object in plain view can be the subject of a search requiring probable cause to examine it further, if the object or area in which it is located bears no relation to the justification for police presence in the first place." *Wamre*, 1999 ND 164, ¶ 15, 599 N.W.2d 268; *see also State v. Runck*, 534 N.W.2d 829, 834 (N.D. 1995).

[¶25] Komrosky argues the broken bulb was not in plain view because McLeish first checked the entryway and the garage to see if any bulbs were missing, and because he walked over to the bulb and bent over to get a better look at it. Our cases on the plain view doctrine do not support this argument. If an officer views the property and has probable cause to associate it with criminal activity, an officer may take a closer look at an object in plain view to determine if it is contraband. *See State v. Koskela*, 329 N.W.2d 587, 591-92 (N.D. 1983). This is precisely what McLeish did when viewing the light bulb. McLeish did not move or touch any piece of the broken bulb until after he realized it was drug paraphernalia. He only bent down to get a better look at it. Furthermore, the fact that McLeish looked to see whether any bulbs were missing before he did so is not dispositive.

McLeish testified at the suppression hearing that he would have recognized what the bulb was even if he had not first looked at the bulbs in the entryway or in the garage. Therefore, McLeish's inspection of the broken bulb was not an independent search requiring probable cause. McLeish was lawfully in a position to view the bulb, and the evidence seized was in plain view.

V

[¶26] The criminal judgment is affirmed.

[¶27] Gerald W. VandeWalle, C.J.
      Daniel J. Crothers
      Lisa Fair McEvers
      Jerod E. Tufte
      Jon J. Jensen